## Case No. 17,068.

### WALKER et al. v. DERBY et al.

[5 Biss. 134.] [1]

Circuit Court, N. D. Illinois. July, 1870.[2]

EQUITY — PLEADING AS EVIDENCE — TERMINATION OF AGENCY—VENDOR AND VENDEE—RESCISSION OF SALE—INADEQUACY OF CONSIDERATION—EVIDENCE.

1. Where, in a bill to set aside a conveyance on the ground of fraud by the defendants, the complainant calls for the answers of the defendants under oath as to the actual date of the execution of a contract relied upon, and the defendants answer under oath that it was not executed until a day much later than its date, the prima facie evidence made by the instrument itself is overcome.

2. In such case the rule applies that the answer called for under oath is, if responsive to the bill, conclusive, unless disproved by two witnesses, or by one witness and strong corroborative evidence.

3. The agency of a real estate agent and his duty to his principal ceases upon the delivery of the title papers and payment for the property.

4. After the termination of the agency the agents have the same right as any other persons to deal in the property.

5. The vendor, in order to set aside the sale, must show that such interest was acquired during the continuance of the agency.

6. If they afterwards acquire an interest from the purchaser, they are under no obligations to disclose that fact to the vendor, and the fact that they do not disclose it to him is not a circumstance tending to show fraud or bad faith.

7. The fact that the notes and mortgage securing the unpaid portion of the purchase money were by agreement left with the agents in escrow, to await the delivery of a quit-claim deed from other parties which the vendor had agreed to furnish, does not change the relation of the parties, nor operate to continue the agency.

8. To set aside the conveyance for inadequacy of consideration the price must be so small as to strike the mind at first blush as grossly inadequate, and raise the conviction that the property was sacrificed.

9. It is not sufficient to show that certain parties might, under certain contingencies, give more on time, when one object of the vendor was to sell for cash.

10. The responsibility of the purchaser, and the negotiability in the market of the securities executed by him, may also be considered.

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

[2] [Affirmed by supreme court; no opinion filed.]

11. Where the principal was present and assisting in the negotiations the rigid rule in regard to the relations between principal and agent do not apply with full force.

12. This fact is especially important as to the question of adequacy of consideration.

13. Allegations in a bill against the purchaser prepared by counsel for such agents but never signed nor filed, are not important as evidence against them on behalf of the vendor.

14. Testimony of witnesses in regard to the value of property at an anterior date commented upon.

15. On the question of adequacy of consideration, its value at a subsequent date cannot be considered. The question is as to its actual market value at the time of the transaction.

This was a bill in equity by John J. Walker, executor, and others, legatees of A. F. Hopkins, late of Mobile, Alabama, deceased, against William M. Derby, S. H. Kerfoot, Isaac F. Pierson, and other grantees, to set aside a conveyance made by the complainant Walker to the defendant Derby in March, 1867, of 32 acres of land, near the southern limits of the city of Chicago. The land is described as follows: The east half of blocks one and six, all of blocks four and five, and lots one, two, twenty-three, and twenty-four of block twelve in Pryor & Hopkins' subdivision of the west half of the northwest quarter of section 3, township 38, range 14, and an undivided half of twenty acres of land in the northeast corner of section 4, same township and range.

The substantial allegations of the bill were, that the real estate in question belonged, at the time of the transaction to the complainants, as executor and legatees of A. F. Hopkins, deceased; that, about the first of March, 1867, said complainant, John J. Walker, employed the defendants Kerfoot and Pierson, then doing business as real estate agents under the firm name of S. H. Kerfoot & Co., in the city of Chicago, as agents to sell said real estate, which employment the said Kerfoot and Pierson accepted; but that said Kerfoot and Pierson, disregarding their duty in that regard, and taking undue advantage of the trust and confidence reposed in them, made a corrupt agreement with Derby whereby they sold said land to Derby at a grossly inadequate price, with a corrupt and secret understanding and agreement between said Kerfoot and Pierson and Derby, that they (Kerfoot and Pierson) were to have and take one half of the said lands, at the price for which they sold the same to the said Derby, and that said Walker, being misled by the confidence he had reposed in the said Kerfoot and Pierson as agents for said complainants in that behalf, consummated and completed the sale thus fraudulently made. Derby, Kerfoot and Pierson, and divers other persons, who had purchased portions of the land, were made defendants, and their answers called for under oath. In their answers Kerfoot, Pierson and Derby explicitly deny the charges of corruption and fraud made in the bill, and insist that Derby was the sole purchaser of the land in question, without any fraud or secret agreement as charged in the bill.

Hill & Dale, for complainants.

Monroe & McKinnon and C. Beckwith, for defendants.

BLODGETT, District Judge. The undisputed facts shown by the evidence are substantially these: That the testator, A. F. Hopkins, died in December, 1865, at Mobile, Alabama, and by his will appointed said John J. Walker and one W. G. Jones his executors. Both of said executors qualified; but Jones, on the 6th of February, 1867, resigned his executorship, leaving the said Walker sole acting executor. By the terms of the will the estate of the testator was to be divided between his wife and children, and the will empowers the executors "to sell and convey all the houses and lots of the testator in the city of Mobile, and all other lots, wherever situated, on such terms and at such times as the said executors shall deem most advantageous to the estate."

After granting this power, the testator proceeds to state: "I have the title to about 36¼ acres of land at, and adjoining the city of Chicago, in the state of Illinois; but my daughter, Maria Walker, has an undivided interest in them of two acres, and my son-in-law, John J. Walker, has an undivided interest of two and one-half acres in that part of my land belonging to J. W. Pryor and myself, and for which the said Walker holds my written contract."

Said testator, Hopkins, had owned said lands since 1853. They were unimproved and unproductive. About the 1st of March, 1867, the Hopkins estate was in pressing need of money to pay debts which could no longer be postponed or delayed; and Walker, as executor, was under the necessity of selling either some improved real estate in the city of Mobile, or this property in Chicago. The firm of Rees & Kerfoot had been, from 1855 to 1860, to some extent, the agents for the owners of said lands, and in 1865 some correspondence in regard to the value and salability of this property had passed between Walker, and S. H. Kerfoot & Co., who, on the dissolution of the firm of Rees & Kerfoot, succeeded to the agency of this property. Walker came to Chicago about the 1st March, 1867, for the purpose of selling said lands, and placed of the business in the hands of S. H. Kerfoot & Co., his chief acquaintance being with Mr. Kerfoot. Walker wished to sell for cash, and Kerfoot advised him that he could not do so without great sacrifice, and told him that it was a bad time to sell; and that he had better wait until spring opened, and until navigation and business again revived prices. Walker then suggested that if he could make a loan of $10,000 to meet his necessities, and secure the same on this property, he would delay selling; but Kerfoot informed him that it would be impossible to negotiate a loan on such security in this city, the land lying outside, and being unimproved.

They visited the land and concluded to put it in the market at $1,000 an acre, cash. Kerfoot stated that he knew of only one man who would be likely to make the purchase, and that was Derby the defendant. He introduced Derby to Walker, stating as his reason for making the proposition to Derby, that Derby had lately been dealing in lots in that vicinity, and had his eye on investments in the southern part of the city, and that Derby having lately sold his house and lot for $45,000, had the means to buy if he chose to do so. Walker and Derby had much negotiating together, which finally resulted in a written agreement between them, bearing date on the 6th day of March, 1867, by which Walker, as executor of Hopkins, agreed to sell the land in question to Derby for $25,600; $8,200 in cash and the balance in three equal annual payments, with interest at six per cent., Walker to give a clear and perfect title.

Walker had an abstract of title prepared, which was examined by H. S. Monroe, Esq., an able lawyer in this city, on behalf of Derby, who pronounced the title satisfactory.

About this time Derby manifested some reluctance to close the bargain and became critical and captious in regard to the title, and finally insisted on a quit-claim deed from the legatees in addition to Walker's deed as executor, this Walker promptly agreed to furnish, and it was agreed that the notes for the deferred payment should remain in Kerfoot's hands until said quit-claim deed was duly executed and delivered. On the 19th of March the transaction was consummated by the execution and delivery to Derby of a full covenant warranty deed from Walker as executor and trustee under the last will and testament of A. F. Hopkins, and the execution to Walker as executor by Derby of the notes to be given for the deferred payments; also, a trust deed on the premises sold to secure the payment of said notes. The deed and trust deed were duly delivered, and Derby paid to Walker the cash payment of $8,200, and the notes, as had been stipulated, were left in the hands of Kerfoot. The deed and trust deed bear date on the 16th of March, but were not delivered nor the money paid until the 19th, when the deeds were duly recorded. On the same day Kerfoot & Co. rendered to Walker their bill for services, commissions and disbursements about the sale and their agency in that behalf, the item of "commissions" being $711. On the 30th of May, 1867, Walker delivered a quit-claim deed to Derby, and became entitled to the delivery of Derby's notes. A new arrangement was, however, entered into between Walker and Derby, by which said notes were paid in full by Derby's paying $10,000 cash and conveying certain real estate in section thirteen, just west of the then city limits, whereupon said notes were delivered to Derby and the trust deeds duly released by the trustee. Some time in September, 1867, an agreement in writing, bearing date March 19, 1867, between the said Derby and the said Kerfoot and Pierson, was filed for record in the office of the Recorder of Cook county, whereby Derby, in consideration of $375 in cash, agreed, in substance, to sell and convey to Kerfoot and Pierson one-half of the real estate bought of Walker, on payment of half of the money Derby had paid down to Walker, and the securing of one-half of the deferred payments by trust deed on said one-half, payable at the same time Derby's payments to Walker matured; said agreement to be consummated on or before the 1st of September, 1867.

It is also shown by the proofs and not denied, that a difficulty arose between the parties, Kerfoot, Pierson and Derby, in regard to the completion of this contract, and that a bill in chancery for a specific performance thereof was prepared by the solicitors of Kerfoot and Pierson, but which was in fact never filed, the matter having been compromised without suit.

So far the facts are undisputed. The complainant contends further that the price for which the land was sold was grossly inadequate and much below the price at which it could have been sold, if due exertions had been made in good faith by Kerfoot & Co., as they were in duty bound to do. Much evidence has been adduced by both parties upon this point. Indeed, the bulk of the evidence taken is upon this question of inadequacy of price, and the neglect or refusal of Kerfoot & Co. to obtain or consider offers from other persons than Derby.

There is really no disagreement between counsel in regard to the principles of law which govern this case; the only difference being as to whether the facts proven by the record make up a proper case for the applications of those principles. The rule of law governing the relations between principal and agent in regard to transactions of this character, is too well known and too familiar to require the citation of authorities. Perhaps it has nowhere been more clearly and concisely stated than in the opinion of the learned Chief Justice Breese of this state, in the case of Kerfoot v. Hyman, 52 Ill. 512. He states the rule as follows: "It is well settled that an agent employed to sell land cannot himself become the purchaser, and he is held to the strictest fairness and integrity, and bound to act in the utmost good faith."

As I have before stated, the defendants, Kerfoot, Pierson and Derby, have each, as required in the bill, answered under oath, and all have broadly and unequivocally denied that there was any agreement between them, by which Kerfoot and Pierson were to have an interest of any kind in the land at the time the sale was made by Walker to Derby; and while they admit the agreement for the purchase of one-half of said land as set forth in the bill, they insist that the said agreement was in fact made some time after the said 19th of March, but before the 30th of May, 1867, when the quit-claim deed was made. It is insisted by the complainant that the portion of the answers setting up the time when this agree-

ment was made is not responsive to the bill. It is true, the answers of the said defendants to the fourth specific interrogatory of the bill only admit that defendants executed an agreement of the tenor effect and date set up in the bill, but it is equally true that the charging part of the bill alleges a corrupt agreement between the parties, Derby, Kerfoot and Pierson, during the negotiation and the sale, and a sale at an inadequate price by reason thereof; and it clearly was the duty of the defendants to answer all the charging parts of the bill. Certainly, the time when Kerfoot and Pierson acquired an interest in the said land was the most material part of the complainants' case, as made by the charges in the bill. The position of the complainant, that the part of an answer of the defendants which states when the agreement was in fact made, is not responsive to the allegations of the complainants, seems to be pressing the question of irresponsiveness to a degree of nicety not justified by the authorities which have been quoted. The complainants in this case had either to prove the allegation upon which they relied for setting aside the sale complained of, by resting upon the prima facie evidence which the written instrument between Kerfoot and Pierson and Derby furnished, as to the time when it was actually executed, or to put in testimony establishing that time as a matter of fact. They have chosen to call testimony, and the testimony they have thus elected to call is that of the defendants themselves. The law is well settled by the supreme court of the United States in regard to the effect of an answer in chancery under oath. In the case of Union Bank of Georgetown v. Geary, 5 Pet. [30 U. S.] 99, the rule was laid down, that the answer of the defendants, called for under oath, if responsive, is conclusive, unless disproved by two witnesses, or one witness and strong corroborative evidence. The same principle is also fully adopted by the same court in Carpenter v. Providence Washington Ins. Co., 4 How. [45 U. S.] 185; Parker v. Phetteplace, 1 Wall. [68 U. S.] 684; Tobey v. Leonards, 2 Wall. [69 U. S.] 423. In this case, the witnesses called by the complainants, namely, the defendants themselves, deny the allegations, pointedly and directly. They state explicitly, that no such agreement as is alleged was entered into by themselves at the time the sale was pending, and not until long after it was consummated, and unless such an agreement was made at the time charged, the complainants have failed to make out their case.

Having, then, failed to prove the case alleged in the bill by the evidence of the defendants themselves, it becomes incumbent upon the complainants to establish the facts alleged by two witnesses, or at least one witness and strong corroborative circumstances. The record fails to show us any witness who has testified in regard to the time when this contract was made, save the defendants, who are called upon to answer under oath, and have answered, stating that this time was long after the sale between Derby and Walker, and long after the time stated in the bill.

There is, then, left on the record, only the presumption arising from the date of the agreement, which is explained away by the answer of the defendants, and which explanation must be accepted as true, and some other circumstances of a somewhat suspicious character, which are relied upon by the complainants as establishing the facts upon which they claim to recover. These circumstances I shall allude to hereafter, but pass from them at present, to say, that I shall assume as an established fact, from the evidence, that the agreement between Kerfoot and Pierson and Derby, which bears date the 19th of March, and which is set up in the complainants' bill, as the fraudulent agreement on which they claim relief, was in fact, made some considerable time after that date, and was so dated for convenience, as stated in the answers.

The material question, then, is, when did the employment of Kerfoot & Co., as agents of Walker, to sell this land, cease? The evidence shows, that they rendered their bill and were paid by Walker for their services on the 19th of March. What was the duty which they had undertaken to perform? Obviously, according to the statements of the bill, to find a purchaser and effect a sale of the land in question. Had they not done this? They had brought Derby and Walker together. The terms of the sale had been agreed upon, the deed from Walker to Derby had been executed. Derby had made his cash payment of the purchase money to Walker, and had executed his notes and trust deed securing their payment. The trust deed had been delivered and recorded, and no act that I can think of remained to be performed by Kerfoot & Co., as real estate agents, in connection with the transaction. It is true they still held Derby's notes, which were not to be delivered to Walker until he delivered to Derby the quit-claim deed of himself and the other legatees of Hopkins; but were they, for this purpose, anything more then mere stake-holders?

It was no part of their duty or function as agents for Walker to hold his pledge that he would keep his promise and word with Derby in reference to this quit-claim deed. But much of the importance of this relation assumed by them in connection with the holding of their notes, depends, perhaps, upon the relation which the quit-claim deed bears to the title itself; and in order to fully appreciate this, it becomes necessary to review the testimony for a moment, bearing upon the capacity in which Walker was acting, and his own relations to the title to the land he was selling. It will be remembered that the will gave Walker, as executor, the most ample power to sell and convey the real estate of the testator. The bill alleges, and the testimony shows, that Walker and his wife, Maria, were each entitled to one quarter of the said Chicago land, but the evi-

dence of their title was not then on record in the recorder's office of Cook county, and Derby and his counsel. Monroe, both testify that they had no idea of the existence of such interest at the time of the purchase.

Walker's wife was a legatee under the will, and the presumption is, that when Walker spoke of his interest in the land, he was understood to refer to the interest of his wife, under the will, rather than to the secret interest manifested by the unrecorded deed between himself and Hopkins. Pryor's evidence shows that the two acres, and the two and a half acres, alluded to in the will of Hopkins, as belonging to Walker and wife, pertained to another tract of land. I consider this fact as clearly proven, that the allusion in the will to the interest of Walker and wife in the tract of land near Chicago, is to another parcel of land purchased by Pryor and Hopkins from John Wentworth, the title to which had been forfeited. Walker testifies that it had become necessary to raise $10,000 out of the property of the estate, to meet pressing liabilities, and he came to Chicago to sell the property, as a part of the estate. His previous correspondence with Kerfoot alluded to the property as the property of the estate. The abstract of title exhibited by him, showed the title in A. F. Hopkins, deceased, and no one else. There was no evidence of record, or in the abstract, that Walker or his wife had any interest or title in the property which Walker proposed to sell. I presume that in the negotiation with Kerfoot and Derby, Walker made the same explanation, in regard to the land alluded to in Hopkins's will, which Pryor has made in his deposition, showing and stating in that explanation, that the land mentioned in the will, as owned by Walker and wife, was not a part of the land that he was then selling. When Walker had agreed upon the terms of sale with Derby, he signed a memorandum agreement, on the 6th of March, as the executor of the estate of Hopkins. His deed to Derby, of the 16th of March, purports to convey the entire estate, under his power as executor of the will. He took the notes for the purchase money, as executor, and that, too, in such amounts that they could not be divided conveniently between himself and wife, in their own right, and the estate of Hopkins, but took them in gross amounts, without reference, apparently, to any interest which he and his wife now claim to have had in the property, at the time of sale. Moreover, Mr. Monroe, an able and experienced real estate lawyer, in this city, passed upon the title, as shown by the abstract, and found the title as shown by the abstract to be in A. F. Hopkins. Could parties dealing with Walker, have supposed he was dealing in any other capacity than as executor, and that the estate for which he was executor, owned the entire property he was selling, and that the only party to be benefited by the sale, was

the estate of Hopkins? It is to be borne in mind that Walker was in no need of money for his own purposes; the only pretext for selling the property was to raise money for the estate. Walker says, that he spoke to Kerfoot about the interest he and his wife had in the land, and asked if a deed from them would not be necessary, to which Kerfoot replied, that the quit-claim deed would make that all right. This was evidently at the end of the transaction, after the quit-claim deed had been agreed upon, and was not thought of or mentioned by Walker, until the deed of Walker had been prepared, and, in fact, was probably executed. In the light of these facts, I can but believe that the quit-claim deed insisted upon by Derby was a mere matter of super-caution on his part, induced, probably, by the experience of himself or others in dealing with executors and trustees, and the numerous litigated cases that had been developed in Chicago in reference to that class of interests.

To my mind it is perfectly clear, under the evidence, that the parties all considered the title made by Walker as executor to be ample. Derby insisted upon the quit-claim deed as an act of ratification and estoppel against the legatees; and Walker, on his part, on its being suggested to him, promptly agreed to obtain it. The notes were left in Kerfoot's hands because Walker was willing to give a guarantee or pledge for the fulfillment of his promise in that regard, and because he had had some conversation in which suggestions had passed between himself and Derby, that Derby might soon be in a condition to cash the notes, or some part of them. Walker had, therefore, no occasion to take the notes away. If he expected to raise money on them, by hypothecation or otherwise, he could best do so in Chicago, where Derby was known. It was, therefore, convenient for him to leave these notes in the hands of Kerfoot as an earnest of his willingness to comply with the terms exacted by Derby.

Concluding, then, that this quit-claim deed was not deemed necessary by the parties to pass the title, I can but believe that Kerfoot and Pierson's agency terminated upon the execution and delivery of the deed from Walker as executor, and that the parties so treated and deemed it. When the agency was at an end they had the same right, as against Walker, to deal in this property as any other persons. The mere fact that they had been engaged as agents for Walker in negotiating the sale to Derby did not estop or preclude them, for all time, from making an advantageous purchase of the property. After the transaction between Walker and Derby was at an end, and their relations as agents ended, there was nothing more to be done by Kerfoot and Pierson in reference to the matter. They had found a purchaser. Walker had, by the money raised from the sale, relieved himself of the pressing neces-

sity which brought him to Chicago. He had given a deed ample, under the power invested in him as executor, to pass the entire property, and it seems to me that there was no longer anything for Kerfoot and Pierson to do in the transaction as agents for complainants in regard to the sale which they had undertaken to obtain for them. Therefore, their agency was at an end. They had fulfilled their agreement and had performed all the duty which the law would imply against them from the terms of their employment. They had been paid, which is usually accepted as the best evidence that the undertaking had terminated and the relations ended.

In disposing of this question as I have, I have, in my estimation, substantially disposed of the case, for, unless the complainants show that Kerfoot and Pierson acquired their interest in the property during the continuance of their agency, the whole fabric of the complainants' case falls; but, as much labor has been bestowed by the counsel, and much stress laid upon circumstances shown in the evidence, which they claim establish the allegations of the bill, in regard to the corrupt agreement charged against the principal defendant, I must, in justice to the counsel and to myself, take a few moments to review the testimony.

In this branch of the case the evidence as to the inadequacy of the price of the property is important mainly as a circumstance tending to show the bad faith of the agent in sacrificing his principal's property for his own purposes. I have, therefore, looked carefully over the evidence as to the point of inadequacy of price, and must say that I fail to find in the record any convincing proof of such inadequacy. It is true that some of the witnesses for the defendants placed a larger estimate upon the value of the property at the time it was sold to Derby than what it was actually sold for; but we must bear in mind that this property had no fixed market or regulated value. Its value, as stated by several of the witnesses, both for the complainants and defendants, was what is termed speculative or prospective, depending upon the growth and development of the city to which it lay contiguous, and also depending upon the fact whether that growth should be in the direction of this property. Here was a growing city. This property lay near the southern limits. It was a problem to be solved only by time, whether the city would expand, if at all, in the direction of this property, or whether its growth would be to the west or to the north, where there was an unlimited area. It was, therefore, a doubtful proposition whether this property would or would not advance in value. Was it not, looking at it from the standpoint of witnesses or purchasers at the time of this transaction, as much a matter of probability that it would decline in value as that it would advance? I cannot

shut my eyes, nor do I think the court ought to do so, to the fact that the unimproved suburban property of the city of Chicago has, within a few years, declined to such an extent as to be almost valueless, or, at least, utterly unsalable, and then advanced within a short time so as to be in great demand at unprecedented prices.

The witnesses on the part of the complainants who testified as to the largest values are Andrews and Pryor; and in regard to these witnesses, I must be allowed to say, that I can but believe, from their testimony, that their judgment as to the value of this land in the early part of March, 1867, is largely colored by subsequent transactions, and the advance in the property, which no one at that time had any valid reason for anticipating. So, too, of several of the other witnesses on the part of the complainants, who fixed the value upon the property; and I might say, in this connection, that the value which they fixed is not so largely in excess of the price at which the property was sold as to strike the mind, at first blush, as grossly inadequate.

The rule laid down by the courts in determining this question of adequacy or inadequacy of price, is, that the price must be so small as to strike the mind, in the light of the testimony, at first blush, as grossly inadequate, and raise the conviction that the property was sacrificed in the market for a price less than its actual value. Let us review this testimony for a moment. Andrews says that he would have paid $1,000 an acre, and perhaps $1,200 an acre, for that portion of the land lying east of State street, and Pryor fixes the value of the land in the light of his subsequent inquiries in April, and some correspondence which he had in February, at $1,500 per acre. Pryor, however, between April and June, according to his own testimony, sold his own land, in the same subdivision, at less than $1,200 per acre; and Andrews, while he says that he would have purchased that portion which lies east of State street for $1,000 per acre, and perhaps would have gone higher, at the same time admits that his ability to purchase depended upon whether he should succeed in enlisting a relative of his in the venture. So that the testimony of these witnesses—and they are the only ones whose testimony is relied upon strenuously on the part of the complainants—fails to show that they, if they had had the money, would have paid much, if anything, over $1,000 for the portion of the land lying east of State street; and all the testimony concurs in establishing the fact, that the land lying west of State street, being an undivided interest, and being in a less desirable locality, would have brought a much lower price in the market. It will be borne in mind that this land sold for about $875 an acre in gross, including the streets.

Now, we must also bear in mind that Walker was here for the purpose of raising money to meet the liabilities of the Hopkins estate; that it was desirable for this purpose not only that he should sell the land for a good price, the

highest he could obtain in the market, but that he should also sell it to a purchaser whose paper would have a marketable value here or wherever he should have occasion to raise money; and I think, in view of the fact that Derby was shown to be a man of large wealth in this community, Walker would naturally have considered him a desirable purchaser, and justify himself for deducting $100 or $150 per acre from a speculative price.

In the light of all these circumstances, taking complainant's testimony alone, it seems to me that the proof does not show any such gross inadequacy of price as to raise the presumption of unfair dealing. But to meet this testimony on the part of the complainant, the defendants introduce the testimony of six witnesses, all of whom are well known to the court, and in whose safe, cautious business habits and judgments the court has much confidence. All of them testify, substantially, that this property was not worth in the market any more than Derby paid.

In connection with this testimony, I will also allude to the fact that Walker was himself present and negotiating this sale, and I doubt whether the rigid rule in regard to the relations between agents and principals should apply with its full force to a case where the principal is on the ground and has an opportunity to understand the situation for himself. It is true that this furnishes no reason why Kerfoot should enter into a corrupt and secret agreement with Derby by which they should acquire an interest in the property unknown to Walker, and while acting as his agent; but upon the adequacy or inadequacy of price as a circumstance tending to prove this secret agreement or establish this theory on the part of the complainant, it seems to me a pregnant fact, because, Walker being here, and having the means of making inquiries touching the value of this property, must be presumed to have acted as much upon his own judgment as upon that of Kerfoot, in regard to whether it was best for him to make the sale of this property at the price which Derby was willing to buy it for, or forego the sale and make provision for the necessities of the estate out of Mobile property. He was to be the judge. He did not rely upon Kerfoot and Pierson in regard to the expediency of selling at the price which Derby offered. He could have repudiated Derby's offer and refused to sell the property at the price offered. He was not obliged to accept the proposition unless his judgment so dictated.

In connection with the same class of testimony, I must also consider the fact that it is alleged in the bill, and there is some proof in the record to show, that Kerfoot did not communicate to Walker all the offers which had been made to him. It is alleged that Andrews had made an offer for the purchase of this property, and that Kerfoot did not communicate that to Walker. In reference to the testimony in regard to Andrews' offer, it will be borne in mind that Walker was anxious to sell for cash; that Andrews left the city upon a problematical and doubtful suggestion that he would purchase, or might purchase, if he could get a relative of his interested with him, thereby clearly conveying the idea to Kerfoot's mind that his purchase, or ability to purchase, was contingent upon what should transpire when he should be able to see the person from whom he expected to raise money; and I can but look upon the testimony of Andrews, in that regard, given at this late day, as to his intentions and purposes at that time, as being given more in the light of his judgment, in looking backwards from the present, rather than in looking forward from the time when the land was sold.

Andrews had made some investments in the locality of this property. He says that he was desirous of purchasing it, but the evidence shows that there was an area of many thousand acres of land adjoining and contiguous to the southern limits of this city, all in the market, all speculative property, all having only a prospective value, and the mere fact that twenty or thirty acres of this land was purchased by some one else in the absence of Andrews, when there were other tracts that he could have purchased for the same price, or even at a lower price, does not, of itself, seem to me to prove that Andrews would necessarily, if he had succeeded in interesting his relative and returned to Chicago, have purchased it at any higher price than Derby did, when he found himself brought in contact with Walker, or became possessed of the information that Walker was under the necessity of selling and was determined to sell at some price or other.

But it is alleged, also, as another circumstance tending to show this fraudulent combination on the part of these parties, that Kerfoot and Pierson's interest in the property was concealed from Walker. The force of this circumstance falls to the ground as testimony, when I have disposed of the main facts in the case, that this purchase was not made until the termination of Kerfoot and Pierson's agency in the transaction. If they had the right to make the purchase, they were then under no obligation to expose their transactions in a business matter to Walker or any other person. They had the right, if they saw fit to do so, to keep it concealed, although there is no evidence, to my mind, of any concealment other than what other business men would have made under similar circumstances.

It is again claimed that the bill that was prepared by Kerfoot and Pierson cuts an important figure as evidence, and that the statements in that bill are conclusive evidence as admissions of parties to show that this secret agreement existed between Derby and Kerfoot from the inception of the negotiations with Derby, and the complainant's counsel have seized upon the allegations in that bill, that "there was a verbal agreement which was subsequently, on the 19th of March, re-

duced to writing," as unanswerable evidence in support of this case. It was admitted on the trial, and also appears in evidence, that this bill was never filed; that differences arose between the parties, and the matter was placed in the hands of counsel by Pierson, and the bill drawn. It never was signed by Kerfoot or Pierson, and, in fact, Kerfoot was not in the United States at the time the bill was drawn. It was made in antagonism to Derby's interest, for the purpose of making out a case against him. And the bill is evidently, as against Pierson, nothing but the work of counsel, without ever having been revised or corrected, or especially adopted by the complainants therein, or either of them. I therefore attach no importance to this bill as a matter of evidence in this case.

It is true there are some circumstances in the case which might go far to raise suspicions in the minds of the complainants that the dealings with them had not been entirely frank.

The date of the agreement, and the fact that the information came to Walker from Pryor, and perhaps from other interested parties, shortly after the sale, that he had not been fairly dealt with, were calculated to raise a suspicion in the mind of Walker; but where is there upon the record any conclusive and tangible proof of which the mind of the court can take hold, as satisfactorily establishing the main allegations in this bill, as against the presumptions of innocence which the law raises in favor of parties thus charged, and their denial under oath of the charges against them. So far as the present price of this property and its rise in value or price after the sale are concerned, they are circumstances which can have and should have no weight with the court. It is a part of the history of this city, and the court cannot close its eyes to the fact that there were extraordinary rises in real estate in and about the city between the 1st of March, 1867, and October, 1868, and it is undoubtedly true that this property partook of that advance, so as to increase fivefold, if not more, in that interval. But the main question really is, Was this property sold for less than its market value at the time of the transaction between Walker and Derby, and was it so sold at the corrupt instance of Kerfoot and Pierson?

In view of all the proof in the record, I am compelled to say that there is not sufficient evidence to satisfy my mind that it was at that time worth any considerable sum more than the $875 which Walker realized per acre for it. It is true, some witnesses say that they might have paid $1,000 or $1,200 an acre; but is it to be presumed that if these witnesses had been brought in contact with Walker, and found that Walker was determined to sell, they would have paid him more than Derby did? If we are to disturb real estate transactions of this city, because of unprecedented and unparalleled advances in price immediately after the sale, there is hardly a title here that could withstand the test of a judicial investigation.

In view, then, of all these considerations, I shall find for the defendants and dismiss the bill.

This case was carried by appeal to the supreme court, and the decision of the court below affirmed by a divided court, at the December term, 1871, no opinion consequently being filed.