# CHARLESTON.

BOARD OF TRUSTEES OF OBERLIN COLLEGE *v.* BLAIR *et al.*

Submitted Sept. 26, 1898—Decided Feb. 4, 1899.

1. FRAUD—*Burden of Proof.*

The *onus probandi* is on him that alleges fraud, and, if the fraud is not strictly and clearly proved as it is alleged, relief cannot be granted. (p. 821).

2. EQUITY—*Fraud—Mistake.*

To entitle a plaintiff to relief in equity on the ground of mistake or fraud, the mistake or fraud must be clearly established. (p. 822).

3. FRAUD—*Proof of Fraud.*
    The general principles applicable to fraudulent representations are well settled. Fraud is never presumed, and, where it is alleged, the facts sustaining it must be clearly made out. (p. 822).

4. TRUSTS—*Sales—Purchase by Trustee.*
    While it is true that a trustee or agent cannot be interested in a sale made by himself, yet when he has fully discharged his trust, and sold property to a third person in good faith, having no interest in the same at the time, he may afterwards acquire the title from the purchaser; and such fact will not afford ground for avoiding the sale. (p. 820).

5. AGENCY—*Real Estate Agent.*
    The agency of a real estate agent and his duty to his principal ceases upon the delivery of the title and payment for the property. (p. 820).

6. AGENCY—*Real Estate Agent.*
    After the termination of the agency, the agent has the same right as any other person to deal in the property. (p. 820).

Appeal from Circuit Court, Doddridge County.

Suit by the Board of Trustees of Oberlin College against J. V. Blair, trustee, and others. Decree for plaintiff, and defendants appeal.

*Reversed.*

SMITH D. TURNER, VAN WINKLE & AMBLER and W. P. HUBBARD, for appellants.

W. N. MILLER, T. E. BURTON, G. W. FARR and BROWN, JACKSON & KNIGHT, for appellee.

ENGLISH, JUDGE:

A controversy existed between C. R. Gains, F. K. Knight, and the Trustees of Oberlin College in regard to a tract of land situated in Doddridge County, containing three hundred and thirty acres. In July, 1895, said parties agreed upon a compromise whereby they should all convey to J. V. Blair the titles they had. Blair was to sell the land, and divide the proceeds between them, giving one-half to the college and dividing the other half between Gains and Knight. In pursuance to this agreement, in September, 1885, and January 1886, the college, Knight and Gains conveyed said three hundred and thirty acres to said Blair

trustee, to sell and convey said land under direction of the grantors, and divide the proceeds, as above mentioned. Blair accepted the trust, and several parcels were conveyed to different persons under it, until, in February, 1892, about one hundred and eighty-eight acres were left. The matters in controversy in this suit grow out of transactions regarding this tract, beginning in February, 1892. A suit was instituted by the trustees of said college in the United States Court, and considerable testimony taken therein when the cause was dismissed for want of jurisdiction, and, by agreement, the evidence taken was allowed to be read in the circuit court of Doddridge County, where the suit was instituted by the college trustees against J. V. Blair and others. The facts which give rise to this litigation grow out of the circumstances surrounding the sale of said residue of land by Blair, trustee. Up to the date of sale, no oil had been found in that vicinity, although great amounts of money had been expended exploring for same.

At the time this suit commenced, Gains had died, and Henry Ash, as sheriff, had been appointed his administrator, and represented the Gains estate in the proceeds arising from sales of this land. F. E. Burton, a lawyer, of Cleveland, Ohio, represented the interests of Oberlin College. F. K. ,Knight, a former clerk of the county court represented one-fourth of the proceeds. The bill charges that on February 18, 1892, Blair wrote to Burton and the board of trustees of the college that he had received an offer of seven dollars per acre for the land, and induced them to authorize a sale at the price, when, in fact, he was conspiring with Ash and McMillan and Pearcy to get the property, and thus obtained assent to the sale. The letter did not disclose that the person who made the offer was Wilkinson, an agent of the South Penn Oil Company. Blair conveyed the land at seven dollars to McMillan, for the real benefit of himself and his associates, on February 23rd, and practiced a fraud on the beneficiaries, Ash being Gains' administrator. The bill further charges that McMillan, in March, leased said land to the South Penn Oil Company for a bonus of five thousand five hundred dollars, and afterwards received rentals and royalties in large amounts; that McMillan, Ash, Blair, and Pearcy were advised of the value of the land as oil property, and the college, as well as said

Knight, was defrauded; and the bill prayed an injunction, the appointment of a receiver, and the cancellation of everything except the lease to the oil company. Answers were filed putting in issue the allegations of the bill, and many depositions taken. On December 3, 1896, a final decree was rendered, holding that the deed from Blair, trustee, to Mc-Millan, dated February 23, 1892, conveying one hundred and eighty-two and seven-eighths acres to McMillan, was procured under such circumstances as not to devest the rights of the beneficiaries, the Board of Trustees of Oberlin College, and the widow and heirs of Gains, deceased, under the trust deed executed to Blair; confirmed the lease made by McMillan to the South Penn Oil Company; and decreed that McMillan be declared to be holding the legal title of the land conveyed to him by said Blair, trustee for said college, for the widow and heirs, and their assigns, grantees, and personal representatives, of C. R. Gains, in their proportion and upon the terms, conditions, etc., contained in the deed of trust made by complainant to Blair on September 19, 1885, and in the deed of trust made to Blair by Gains and Knight, on January 13, 1896,—that is to say, in the proportion of one-half undivided interest therein to the complainant and one-fourth undivided interest therein to said widow and heirs and their assigns; but, inasmuch as said Knight had entered no appearance and asked for no affirmative relief in the cause decreed as to the original one-fourth undivided interest held by him in said land under the trust invested in the said Blair, trustee, said McMillan holds such interest in trust for Knight and himself, and said Blair, Ash, and L. W. Pearcy's estate, in proportion of one-fifth of the whole etate to said Knight, and one-eightieth interest each in the whole to Blair, Mc-Millan, Ash, and the estate of L. W. Pearcy, deceased, and upon the terms of the deed from Blair, trustee, to Mc-Millan, and of the contract between Blair and others and McMillan, set forth in the bill and pdoceedings, to direct how the oil parties should account to the parties aforesaid for royalty when the receiver was discharged and the cause finally determined; perpetuated the injunction against McMillan, etc., their agents, etc.; and directed that Blair, Ash and the McMillan estate should be required to account as trustees to the complainant, and to the widow

and heirs, the grantees and assigns, and the administrator of the estate of C. R. Gains, deceased, according to their respective rights and interests, for the amount of bonus received, and the rent aforesaid, and all other rents received or which may be received, subject to the credit of proportionate amount of the purchase money paid by McMillan to Blair, trustee, and any proper charges for taxes or otherwise chargeable against said land; and from this decree S. B. McMillan, Henry Ash, and Jackson V. Blair obtained this appeal.

The litigation in this case is manifestly the result of a train of circumstances which not infrequently occurs in this State of late years, when a few acres of barren, unproductive hill land becomes suddenly of immense value, by reason of the discovery of petroleum in the immediate vicinity, and the former owner finds he has been too hasty in parting with his title, and seeks some loophole by which he regain his possessions. The circumstances relied upon by the complainant to establish the fraud relied on to invalidate the sale made by Blair, trustee, to McMillan, of the land in controversy, are contained in a small compass, and cluster around the sale made in February, 1892. On the 15th of February, McMillan and Pearcy saw Blair, and proposed to buy the land, which had been held at five dollars per acre. Blair told them that he understood that one dollar bonus was being paid, and that he would not recommend a sale at less that six dollars. This they agreed to pay, and Blair promised to report the offer, but neglected to do so; which failure does not comport well with the claim of plaintiff that he meant to conspire with these parties. On February 18th, Wilkinson offered Blair seven dollars, limiting his offer until Saturday, as Blair says, Wilkinson denies the limit of time, but admits that he was to get his answer on that day. On the evening of the 18th, Blair informed Knight and Ash of Wilkinson's offer, and wrote the following letter to F. E. Burton, attorney for plaintiff, which he read to Ash, as representative of the Gains estate, and Knight: "West Union, W. Va., Feb. 18, 1892. Hon. F. E. Burton and the Board of Trustees of Oberlin College, Cleveland, Ohio—Dear Sir: I have been offered seven dollars ($7.00) an acre for the residue of 'Spy Run' lands held by me as trustee, etc. This is $2.00 more than we had offered it at hereto-

fore. The rise in price is owing to the fact that an oil well is going down at or just below Centre Point, a mile and a half of this land; and I'm informed that the drill has gone through the 'Big Injun' in which salt water and gas were only found, but the operators are going onto the Gordon. Four other holes have gone down in this vicinity, and said to be 'dry.' The other parties in interest, Knight and the representatives of Gains' estate, say close up at once, as the 'little boom' may only last a few days. So, if you will wire me or write your approval, I can close up the sale by deed Saturday, as the bid is only given until that time, at which time I have agreed to make conveyance with your approval. This offer is on all the balance of the land outside of the part held and claimed by Wm. E. George, as shown on the plat made for me by Sherwood & Co., of which I presume you have a copy, as I sent it to you for that purpose. Taking the George part out, will leave about 182 to 188 acres, for which I am offered the $7.00 per acre, and which I deem best to take, as the land itself, is not worth over $5.00 per acre. Write if you get this in time; if not, wire me, using Central office at once, and oblige, yours, very truly, J. V. Blair, Trustee." Now, while Wilkinson in his testimony denies the limit of time, yet it appears that he called on Blair on the 20th, and says he was to give his answer on that day, but that Blair had not yet received an answer from Burton. The above letter reached Burton on Saturday, February 20th, and he wired Blair to sell at seven dollars. This message was received by mail at 6 o'clock in the evening, when Wilkinson was gone. On the same day it appears that McMillan and Pearcy called upon Blair, and asked if he had heard from Burton in regard to their offer of six dollars, made on the 15th, and were informed that he had failed to submit it, and had subsequently received the offer of seven dollars from Wilkinson, which he had submitted, and upon which he was expecting an answer. After the telegram was received from Burton, and Wilkinson was gone, and, as Blair understood it, Wilkinson's limit had expired, McMillan agreed to take the property at seven dollars, the same Wilkinson offered. He had not reported the name of the purchaser to Burton, and, if he had, it would not have been material, as he was authorized to sell at seven dollars,

and did sell it to McMillan at that price; but, before doing so, he explained the situation to Ash and Knight, and obtained their consent to convey to McMillan. The fact that neither McMillan nor Ash were advised as to the finding of oil in the Sullivan well, or in the immediate vicinity, is shown by a transaction which occurred on the 22d of February, when McMillan leased four hundred and fifty acres of land in that neighborhood to the South Penn Oil Company at one dollar per acre, and Ash, the same day, sold leases covering one thousand four hundred and forty-one acres for less than one dollar per acre. On the 23d of February, Blair conveyed to McMillan at seven dollars per acre. On the 26th he settled with the beneficiaries, and on the 29th McMillan sold to Blair, Pearcy, and Knight, one-fifth each, at cost price, and Knight leased his one-fifth interest to Ash. Now, if McMillan had attached any particular value to his land by reason of its containing oil or other mineral, how can we reconcile such knowledge with the fact that he parted with four-fifths at the same price he gave for it? And Knight certainly knew nothing of the oil value of the land, or he would not have released to Ash. Did Blair conspire with McMillan and the others to defraud the complainant? If such had been his intention, would he have failed to submit the offer to Pearcy, etc., for six dollars, and sought to have obtained a higher price from Wilkinson, if he were conspiring with others to cheat the Oberlin people, and was to share in the purchase? His interest surely would have directed him to buy at the lower figure. Again, if he knew the value of the property, his interest would have prompted him to secure more than one-fifth The letter to Burton, advising him of Wilkinson's bid, was read to Knight and Ash, and they approved of it, and agreed the opportunity for selling at seven dollars should not be allowed to slip. Until February 18th, Blair, Knight and Wilkinson were seeking to sell to Wilkinson, and in that sale, of course, Blair was interested only to the extent of his commissions. Blair concealed nothing in his letter to Burton. He says an oil well "is going down at or below Centre Point, a mile or a mile and a half from this land," etc. The others interested, Knight and the representatives of the Gains estate, say close up at once, as the 'little boom' may only last a few days." Knight admits that this

letter was shown to him, and he assented to it. It could not have been written with any expectation of selling to Mc-millan, and, if Wilkinson had remained until the telegram came from Burton,, he undoubtedly would have become the purchaser. Now, it is apparent that Burton, Knight, and the representatives of Gains were willing to sell at seven dollars per acre. Burton asked no questions as to the purchaser. He thought it best his client should sell at seven dollars. On February 23d, in pursuance of a telegram from Burton, Blair sold and conveyed to McMillan at seven dollars. On the 29th, though Knight says he never consented to the sale of his one-fourth interest to McMillan, yet, after the conveyance to McMillan,, he took from him one-fifth interest in the property, instead of holding one-fourth. The sale was made to McMillan, and on the 26th Blair settled with Burton and the other fiduciaries. Now, where is the fraud which was perpetrated on Burton or his clients? They received what they were willing to sell for, and, if Blair saw proper afterwards to buy one-fifth interest in the property, it is difficult to discover why Mr. Burton or his clients should complain. On February 27th he wrote: "Your favor of 26th inst., inclosing check for $616.21, is at hand. Please acknowledge thanks for same. We are particularly anxious to have this paid at this time."

At the time of the sale to McMillan, so far as the evidence discloses, no one was aware of the existence of oil in the Sullivan well, except the immediate employes of the South Penn Oil Company. On February 22d, Ash and McMillan were ignorant of the existence of oil in that well, or they would not have leased for one dollar per acre or less. Wilkinson had taken particular pains to spread the report that there was only salt water and gas there. After the sale had been made to McMillan, with the consent of all, the deed was made, and purchase money paid, the property was McMillan's to do with as he pleased. He could sell to Blair or any one able to purchase it. So,, in the case of *Robertson v. Chapman.* 152 U. S. 683 (14 Sup. Ct. 745) Mr. Justice Harlan, delivering the opinion of the Court, said: "A real *bona fide* sale of the property through the agency of Polk, and upon terms prescribed by the plaintiff, and which sale was substantially completed between vendor and vendee, intervened between Polk's acceptance of the position of agent

and his purchase of the property from the plaintiff's vendee." It appears in that case that Mr. Polk wrote to Robinson as follow: "A man by the name of O'Donahoe says he will give $4,000 for that property,—$1,000 cash, balance in three equal payments, at 7 per cent., secured by mortgage on that together with mortgage on other property, so that security will be ample. Not long ago he offered $4,000 cash, but times are dull here now, and he says the time payment is the best he will do." To this letter Robinson replied in a day or so: "I am decidedly of the opinion that the property in your city should be sold, and that, too, at once. I think the offer a fair one, and you are authorized to accept the same. Please send me the mortgage and notes as soon as consummated." Polk sold to O'Donahoe, and received cash payment. Robinson made the deed to O'Donahoe, and took mortgage to secure deferred payments. After O'Donahoe sold and conveyed the property to Polk, and the court in its opinion says: "So, that at the time Polk took the property from O'Donahoe, it was not in the power of the plaintiff (Robertson) or of O'Donahoe to rescind the contract between themselves, and Polk's agency for the sale of the property had in every matrial sense terminated." Again, in the case of *Walker* v. *Carrington*, 74 Ill. 446 (Syl. point 8), the court held that, "while it is true that a trustee or agent cannot be interested in a sale made by himself, yet when he has fully discharged his trust, and sold property to a third person in good faith, having no interest in the same at the time, he may afterwards acquire the title from the purchaser, and such fact, or the fact that his wife acquire the title, will not afford ground for avoiding his sale." We find the law thus stated in *Walker* v. *Derby*, 5 Biss. 134, (Fed. Cas. No. 17,068, Syl. point 3): "The agency of a real estate agent and his duty to his principal ceases upon the delivery of the title papers and payment of the property." Also point 4: "After the termination of the agency, the agents have the same right as any other persons to deal in the property." When we revert to the immediate circumstances surrounding this transaction, and seek among them for the motives that actuated Blair when he wrote this letter to Burton, it is found that he did not act alone in making the representations therein contained. Knight testifies that he had no understanding that he

was to get any interest if the land were sold to Wilkinson. He also states that he and Ash were present in Blair's office when this letter was written; and Ash says that Blair took the letter out of his copy press, and read it over to Knight and himself, and all concurred in it. When this letter is read through it bears none of the marks of fraud. It conceals nothing in regard to the efforts being made in the immediate neighborhood to discover oil, but states them frankly, and assigns them as a reason for the two dollars per acre advance in the price. It also states truly that the other parties in interest, who were there on the ground, said: "Close up at once, as the 'little boom' might only last a few days." He was then expecting to sell to Wilkinson. and no one contends that Blair could ever have acquired any interest if Wilkinson, the agent of the South Penn Oil Company, had got it. This letter was approved by Knight and Ash. None of them thought they should lose the opportunity of selling at seven dollars; and so, when Wilkinson's limitation was out, and McMillan' offered to take it at Wilkinson's bid, Knight and Ash directed Blair to sell to Mc-Millan. Burton asked no questions as to the purchaser; all he seemed to care for was the seven dollars per acre, which he got. It was sold in strict pursuance of his directions. and we cannot say from the evidence, that Blair had any understanding or agreement with McMillan before the sale was made that he was to become the owner of any interest after it was sold to McMillan. After the sale, the entire purchase money was paid to the parties entitled thereto, Burton receiving one-half and Knight one-fourth. Knight afterwards bought back a one-fifth interest, which he leased to Ash, and he swears in his testimony that, as late as the last of March, he had no idea that there was oil on the land, otherwise he would not have leased to Ash. Blair conveyed the property to McMillan on the 23d day of February. On the 29th, Blair purchased from McMillan a one-fifth interest; and Pearcy, Ash, and Knight each also took one-fifth. But there is no evidence in the case that Blair contemplated becoming interested in the property at the time he made the sale to McMillan.

Upon this question of fraud this Court held, in the case of *Arden* v. *Wagner*, 25 W.Va. 356, that "the *onus probandi* is on him who alleges fraud, and, if the fraud is not strict-

ly and clearly proved, as it is alleged, relief cannot be granted, although the party against whom relief is sought may not have been perfectly clear in his dealings." Again, in the case of *Wood* v. *Harrison*, 41 W. Va. 386, (23 S. E. 563), this Court, speaking through JUDGE BRANNON said: "We cannot convict her of fraud, without evidence, though she be the debtor's widow. Fraud must be proven; it cannot be presumed. Though wife, she is entitled, in a court of justice, to hold the defnse of a purchaser, unless fraud is fixed upon her." In the case of *U. S.* v. *Hancock*, 133 U. S. 193, (10 Sup. Ct. 264,) speaking of the evidence of fraud. Brewer, Judge, said: "Not only are not they the clear, convincing, unambiguous proofs of fraud required to set aside a patent, as declared by this Court in the case of *Colorado Coal & Iron Co.* v. *U. S.*, 123 U. S. 307, (8 Sup. Ct. 131,) but all combined create nothing more than a suspicion. They may leave a doubt, but they do not bring the assurance of certain wrongs." Again, in *Baltzer* v. *Railroad Co.*, 115 U. S. 634, (6 Sup. Ct. 216,) it was held that, to entitle a plaintiff to relief in equity on the ground of mistake or fraud, the mistake or fraud must be clearly established. And in *Farrar* v. *Churchill*, 135 U. S. 609, 615, (10 Sup. Ct. 773,) Chief Justice Fuller says: "The general principles applicable to cases of fraudulent representation are well settled. Fraud is never presumed, and, where it is alleged, the facts sustaining it must be clearly made out." Now, what was it Blair knew that he did not impart to Burton?

The evidence clearly shows that the existence of oil in the Sullivan land was not concealed by Wilkinson, but he told everyone that they had found nothing but gas and salt water. That McMillan and Ash knew nothing of the existence of oil in the Sullivan land is shown by the fact above stated, that, on February 22d, they parted with the oil interest in their lands, amounting to one thousand. eight hundred acres, at one dollar per acre; and McMillan would not have parted with four-fifths of this one hundred and eighty-two acre tract at the same price he paid if he had known its value. Again, Mr. Burton, when asked as a witness, what it was that Mr. Blair ought to have told him and did not, could only say that Mr. Blair failed to mention his own possessed share in the purchase. There is no evidence in the case to show that Blair intended to pur-

chase when he wrote Burton. On the contrary, the testimony shows that he expected them to sell to Wilkinson, and, looking at the entire testimony, we can find no misrepresentation made or fraud practiced upon the plaintiff, and must hold that the evidence does not establish that the defendant Blair in any manner violated the trust imposed in him. The decree complained of is, therefore, reversed, and the plaintiff's bill dismissed.

## ON RE-HEARING.

After carefully considering the petition for rehearing in this case, and the arguments advanced in the support of the same, I have been unable to reach a different conclusion from the one announced in the above opinion, which was handed down on the 20th of April, 1898, and from which a rehearing was granted on the 6th of May, 1898. I now adopt said opinion, and would add nothing thereto, but for the fact that counsel seem to consider that the questions raised by the answer and cross bill of the widow and the heirs at law of C. R. Gains, deceased, have not been given the attention to which they are entitled. As stated in the above opinion, at the time this suit was brought C. R. Gains was dead, and Henry Ash, as sheriff, had been appointed his administrator, and represented the Gains estate in the proceeds arising from the sale of this land. It appears that the land in controversy was conveyed to J. V. Blair, trustee, as the result of a compromise made July 24, 1885. This tract and some other lands had been held jointly by the board of trustees of Oberlin College, F. K. Knight and C. R. Gains, the first named owning one-half and the other two one-fourth each; and they agreed to convey it to said Blair, trustee, to sell and convey, by deed, said land, under the directions of the grantors, and said trustee was to divide the proceeds among the grantors in the proportion of their respective interests therein, after paying the expense of the trust. The land was sold under the direction of the plaintiffs, the administrator of C. R. Gains, and F. K. Knight. It is claimed for the Gains estate that Henry Ash, administrator, had no right to consent to the sale made by Trustee Blair. The land, however, was articled to be sold, and at the time of the sale

must be regarded as personalty, and, being personalty, it was one of the duties of the administration to deal with it. On this question, we find the law stated in 2 Story, Eq. Jur. § 1212, where it is said: "Another class of cases illustrating the doctrine of implied trusts is that which embraces what is commonly called the equitable conver- sion of property. By this is meant an implied or equitable change of property from real to personal or from personal to real, so that each is considered transferable, transmis- sable, and descendible, according to its new character, as it arises out of the contracts or other acts or intentions of the parties. This change is a mere consequence of the common doctrine of courts of equity, that where things are agreed to be done they are to be treated for many purposes as if they were actually done. * * * Land articled to be sold and turned into money, is reputed money, and money articled or bequeathed to be invested in land is or- dinarily deemed to be land." See *Turner* v. *Davis*, 41 Ark. 270, a very similar case to the one under consideration, in which there was litigation among heirs as to a tract of land, and, by agreement, it was conveyed to a trustee to be sold, and the proceeds divided, and it was held to be personalty. See, also, *Zane* v. *Sawtell*, 11 W. Va. 43.

As to the time when the conversion takes place *inter vivos*, Pomeroy, in his Equity Jurisprudence (section 1162, vol. 3, says: "Subject to this general modification, the rule is settled that the conversion takes place in wills as from the death of the testator, and in deeds and other in- struments *inter vivos* as from the date of their execution." In the case of *Zane* v. *Sawtell*, *supra*, James W. Zane and wife conveyed to a trustee certain lots, "in trust that he should sell and dispose of said lots as occasion might fairly offer," etc.; and GREEN, JUDGE, in delivering the opinion in that case, said: "Unquestionably the deed of James W. Zane and wife, in the view of a court of equity, impressed on these twenty-one lots the character of personalty, and upon his death his interest in these lots would have passed to his personal representatives as personalty, and not to his heirs as realty. This is a sequence of the familiar prin- ciple that a court of equity regards land deeded or devised to be sold and converted into money, either articled or bequeathed, to be invested in land, as having the charac-

ter of the property into which it is to be converted, though the actual conversion by sale or purchase · has not been actually effected,"—citing *Harcum's Adm'r* v. *Hudnall*, 14 Grat. 369, and numerous other authorities, among them *Craig* v. *Leslie*, 3 Wheat. 563, which is regarded as a leading case on the question. The same principle is announced in the case of *Ropp* v. *Minor*, 33 Grat. 109; *Effinger* v. *Hall*, 81 Va. 107. Authorities might be multiplied in support of this proposition, but these are deemed sufficient, when applied to the facts · of the case, to lead to the conclusion that the conveyance made to J. V. Blair of the land in controversy converted the same into personalty, and, as such, it devolved upon Henry Ash, as administrator of the estate of C. R. Gains, to direct the sale · of said tract of land, and receive and administer the proceeds as part of the personal estate of his intestate. I hold now, upon a review of the entire case, as I held in the above opinion, that the decree complained of must be reversed and the bill dismissed.

*Reversed.*