WILLIAM BROWNELL

*v.*

NORVAL DIXON.

1. PERSONAL PROPERTY.— *what is evidence of ownership.* The possession of personal property is *prima facie* evidence of ownership, and the term, " personal property," applies as well to notes and money, as to goods and chattels.

2.  AGENCY — *husband may act as agent of wife.*  A husband may act as the agent of his wife, in the control and management of her personal property, either generally, or under special instructions, but she should be careful to see that her husband is acting, in truth and in fact, in that character, as very slight circumstances, may, in certain cases, be sufficient for a jury to infer, that the property he is managing, is really his own, and not that of his wife.

APPEAL from the Circuit Court of McLean County; the Hon. J. M. SCOTT, Judge, presiding.

This was an action of replevin, commenced in the Circuit Court of McLean county, by William Brownell against Norval·Dixon, the sheriff of that county.

The declaration is in the *cepit* and *detinet,* for two billiard tables.  The defendant pleaded :  First, That the property was not the property of the plaintiff; Second, That it was the property of Byron W. Gray; Third, An avowry as to the taking, as sheriff of McLean county, and the detention, by virtue of an execution from the McLean Circuit Court in favor of one Thomas Ashley, and against Bryan W. Gray, issued May 29, 1863, on a judgment in favor of Thomas Ashley, and against Byron W. Gray, for eighty-eight dollars and twelve cents and costs; And fourth, a plea denying the unjust detention charged.  To these several pleas, replications were filed and the issues made up, which were tried by a jury, and a verdict found for the defendant.

A motion to set aside the verdict and for a new trial was entered by Brownell, on the ground that the Court erred in giving the instructions asked by the defendant, particularly the sixth instruction ; and that the verdict was contrary to law and evidence.

This motion was overruled and exception taken.  Judgment was rendered on the verdict, from which this appeal is taken, and the following errors assigned on the record :

The court erred, to the prejudice of the appellant, in giving the instructions for the defendant.

In giving the sixth instruction.

In overruling the motion for a new trial.

The facts of the case appear to be that one E. B. Steere, on the 20th of February, 1863, gave, as he testified, as a present to the wife of Byron W. Gray, who was his sister, four promissory notes of one thousand dollars each, all dated on the 20th day of February, 1863, and due in four, six, eight and twelve months, respectively, and payable at the Home bank, in Bloomington, with seven per cent. interest from date. Steere paid two of the notes, one of them by a check on the bank and the other at different times. Steere stated, that Gray bought a saloon with the billiard tables, for Brownell, but was not present at the trade. He said he furnished the money to plaintiff to make the last payment on the tables, and he has refunded it; that Gray took possession of the saloon and carried it on until he was taken with the sickness which terminated in his death. Steere said he paid on the second note he had given to Mrs. Gray, money to B. W. Gray sometimes, and sometimes to Mrs. Gray, but don't know that he ever saw the notes in the hands of B. W. Gray, who had not much money at that time; he had acted as clerk for Steere at sixty-five dollars a month but as Steere thought he was not worth his wages, he told him to leave, which he did.

It appears that B. W. Gray owed for goods he had purchased in New York and elsewhere, about twenty-four thousand dollars, which Steere undertook to pay, he receiving from Gray the goods, at about fifty per cent. less than cost. Steere's statement is, that he was residing in a town in Western New York where he had been doing business as a merchant for a number of years, when a message came to him from Gray's creditors in New York, requesting him to go out to Bloomington and buy out Gray's stock at fifty cents on the dollar and pay them the amount. He went to New York and had a conference with the creditors, but finally returned home without making any arrangement and with no intention of doing anything in the matter. Shortly after returning home, he says a large majority of Gray's New York creditors urged him to come to Bloomington and take the stock for fifty

cents on the dollar of their cost, and pay them; that he came out, invoiced the goods, took them into his own possession and gave B. W. Gray his notes for the amount, and shortly after went to New York and saw the creditors, all but two or three of whom gave him up Gray's paper and took his in lieu, at forty cents on the dollar; he says he gave his notes to the assenting creditors to the full amount of all the purchase money of Gray's stock, and he has paid them up, that on his return with Gray's paper he took up the notes he had given to Gray for the goods, and that the trade with Gray was an honest, fair and *bona fide* transaction. Gray had no money besides the salary of sixty-five dollars a month Steere paid him for clerking — he was poor; that owing to the war the goods he got of Gray rose rapidly in value on his hands, many of them trebled in value before they were sold; that he had made a good thing by this trade, and made a great deal of money on the goods and felt that under the circumstances he was able to make the present to Mrs. Gray of four thousand dollars, having made such a large amount of money on the goods.

*Joseph Johnson* testified that he saw Brownell pay to Doolittle and Thompson, the money for the saloon and tables — don't know the exact amount, but saw a one thousand dollar, and a five hundred dollar bill and some other money — he was a clerk for Doolittle & Thompson while they owned the saloon. B. W. Gray seemed most active in making the trade for Brownell. He was hired by Gray as a clerk for Brownell. Gray stayed in the saloon and came there almost every night after Steere's store was closed — had seen Gray take the money out of the drawer at night in closing up, but usually Brownell did that — had frequently seen Gray show a thousand dollar Treasury note at the counter before the saloon was purchased.

*Mrs. Gray*, the widow of B. W. Gray, stated on being released by the plaintiff from any liability on account of the property in suit, that the notes were a present from Mr. Steere to her; that the saloon was bought with her money

obtained from Steere on the notes, and some $500 more which she had received partly from her mother's estate and partly from Mrs. Wambaugh, whose son she had boarded and nursed through sickness, as a present; that she took no part herself in buying the saloon, but authorized it to be bought for her as it was bought; that her husband, B. W. Gray, had no money of his own in the saloon; that after her husband's death she sold out the whole establishment to the plaintiff, and took plaintiff's notes for some $1,000 and two of these notes have been paid by plaintiff.

It was then admitted by the defendant that the property in controversy was a part of the property described in the invoice as part of the stock of the saloon, and that when he levied on it, it was in the possession of the plaintiff; that the plaintiff claimed it as his, and that he told the plaintiff that the only way by which he could get the property was by replevying it out of his hands.

This was all the evidence for the plaintiff.

For the defendant, *William Doolittle* testified that he was one of the firm of Doolittle & Thompson; that Gray did all the negotiating about the purchase of the saloon, but said he was buying it for some one else; witness did not care who he was buying it for so the money was paid; supposed he was buying for plaintiff; plaintiff paid the money, about $1,800; Gray was present; among the money was a $1,000 greenback that Gray had shown to witness, or a bill of similar amount and kind, and also two or three of the notes from Steere to Mrs. Gray, when talking about the trade, and said he was all right, and could pay for the saloon; that Doolittle & Thompson had given a chattel mortgage to Brunswick & Bro., of whom they had bought the tables, to secure the payment of two notes for $225 each; that as a part of the consideration, these notes were to be taken up; that Gray wanted Brunswick & Bro. to take plaintiff's notes and a new mortgage, as the notes were not yet due; but finally an arrangement was made, Brunswick & Bro. throwing off $25 for prepayment; that some delay was caused from the notes being

in Chicago; that when the notes were sent to Bloomington, witness went with Gray, to the office of M. W. Packard, to whom Gray paid the money and lifted the notes; witness was frequently in the saloon; saw Gray there, who seemed to be acting as boss; Doolittle & Thompson delivered possession to B. W. Gray, Gray taking the key.

On cross-examination he stated: Plaintiff was frequently in the saloon and he had seen him at night, when the saloon closed, take the money from the drawer, and when plaintiff was in the saloon he acted as proprietor, by going behind the bar, etc.

Defendant then called *Thompson*, the other member of the firm of Doolittle & Thompson, who testified substantially as follows:

That Gray was active in buying out Doolittle & Thompson, and after the purchase acted as proprietor. Has seen plaintiff in saloon acting as proprietor. Witness left Bloomington shortly after the sale of the saloon, and did not return till after Gray's death. Saw Gray have a $1,000 Treasury note frequently before the purchase of the saloon.

*S. B. Hance* testified: That B. W. Gray applied to Messrs. Hance & Toms, lessors of the saloon premises, and inquired of him if they would be willing for him to take the saloon lease, to which witness assented. Did not know plaintiff's name until he saw it when the assignment of the lease was brought to witness for approval. Saw Gray afterwards, generally in charge of the saloon; he seemed to have control. Saw plaintiff there at night, who also seemed to take charge of the business.

*Clarkson Toms* testified: That he was one of the firm of Hance & Toms; that Gray spoke to him about assignment of lease; don't recollect hearing plaintiff's name mentioned but Gray said he wanted it for a young man or boy that he wanted to give something to do. Hance signed the assignment. Gray seemed to be boss about the saloon. Have seen plaintiff there behind the bar.

*M. W. Packard* testified: That Gray paid him the money on the back notes of Doolittle & Thompson as stated by Doolittle. Brunswick then satisfied the chattel mortgage on the tables. Gave the notes to Doolittle. A short time before this, Gray came to his office with Mr. Nightwine, and paid some $200 or $300, balance on a note due the estate of McKisson, which was a lien by mortgage upon his dwelling house, and then inquired for the other note, which was for about $500, and held by another party, and said he had the money and wanted to pay it off. He then showed a pile of money, and said he was all right; don't know whose money Gray had, only from the fact of its being in his possession.

*Thomas Ashley, Jr.,* testified: That B. W. Gray wanted the privilege of his father, the owner of the house, and plaintiff in execution, to get another room in the house, and to make some alterations in doors, etc., saying that he was going to make a big thing of it. Gray paid the rent of a small room adjoining the saloon that Doolittle & Thompson had formerly rented for an oyster saloon.

The defendant then introduced the judgment and execution in favor of Thomas Ashley, against B. W. Gray, and showed other judgments against Gray for about six thousand dollars.

The plaintiff recalled Steere, who stated that he loaned the money to plaintiff to pay the notes to Brunswick & Bro. secured by chattel mortgage.

On this evidence, the court gave the following instructions for the plaintiff:

1. If the jury believe from the evidence that Mr Steere gave to Mrs. Gray money or notes as a present, then the money or notes was Mrs. Gray's; and if the jury believe that the property in controversy was bought with this money or notes for Mrs. Gray, then the property becomes Mrs. Gray's; or if they further believe from the evidence that Mrs. Gray sold the property to the plaintiff, then they will find for the plaintiff.

2. If the jury believe from the evidence that the property was bought with Mrs. Gray's money for her, or was bought with her money and plaintiff's money, for her and plaintiff, and that Mrs. Gray either sold the whole goods or her interest to the plaintiff, then they should find for the plaintiff.

3. If the jury believe from the evidence that the property in controversy was bought of Doolittle & Thompson with the money of Mrs. Gray and for Mrs. Gray, then the goods were the property of Mrs. Gray, and if they further believe from the evidence that Mrs. Gray sold the property to plaintiff, then they will find for the plaintiff.

4. A husband may act as agent for his wife, in the control and management of personal property of his wife, and if the property controlled by the husband, is in fact the property of the wife, then such control and management by the husband does not alter the title to the property, and if the jury believe from the evidence that the property in controversy was the property of Mrs. Gray, then even if Gray did control and manage it, this did not make it the property of Gray.

5. Fraud cannot be presumed, but must be proven.

And the defendant asked, and the court gave, on his behalf these instructions:

1. The court instructs the jury that if they believe from the evidence that the property in question was really the property of B. W. Gray, the defendant in execution at the time said execution came into the hands of the sheriff, then they were liable to be levied upon by said execution, and the jury will find for the defendant.

2. That if the ownership of the goods in question was in fact in B. W. Gray, and the pretended ownership by Brownell or Mrs. Gray, was fraudulently claimed for the purpose of covering up said goods and keeping them out of the way of the creditors of B. W. Gray, they will find for the defendant.

3. That the possession of personal property is *prima facie* evidence of ownership, and the term "personal property" applies as well to notes and money as to goods and chattels.

4.   That the plaintiff in order to recover in this case must prove to the jury by a preponderance of evidence that the property in question was the property of Brownell, the plaintiff.

5.   That fraud may be shown by facts and circumstances proven to the jury by evidence.

6.   The court instructs the jury that although the notes given by Steere to Mrs. Gray have been in fact her own by a gift from Mr. Steere, yet if the jury further believe from the evidence, that Mrs. Gray gave said notes to her husband, B. W. Gray, to trade upon and expend and lay out as he thought proper, and that said B. W. Gray bought the billiard tables in question without any special understanding or agreement with his wife, Mrs. Gray, that the same should be done in her name, then they became the property of B. W. Gray, as far as his creditors are concerned, and were liable to the execution in favor of Ashley, and the jury will find for the defendant.

To these instructions the plaintiff, at the time, excepted.

Mr. R. E. WILLIAMS & Mr. J. LEAMING for the appellant.

Mr. JUSTICE BREESE delivered the opinion of the court:

The only questions made in this case, arise on the third and sixth instructions given by the court, on behalf of the defendant.   The third is as follows:  The possession of personal property is *prima facie* evidence of ownership, and the term "personal property," applies as well to notes and money, as to goods and chattels.

The truth of this proposition is not denied, but it is insisted, it was not applicable to the case, and was calculated to mislead the jury.

It appears, certain notes amounting to four thousand dollars, were claimed as having been presented as a gift by one Steere, the brother-in-law of Mr. Gray to Mrs. Gray, and

which had come to the hands of her husband, B. W. Gray. The court had, before, in the first instruction, told the jury, if they believed from the evidence that Steere gave Mrs. Gray the money or notes as a present, then the money or notes were Mrs. Gray's; and if they believed that the property in controversy was bought with this money or notes for Mrs. Gray, then the property became Mrs. Gray's; or if they further believed from the evidence, that Mrs. Gray sold the property to the plaintiff, then they will find for the plaintiff. To the same effect, are the second and third instructions. In the fourth instruction, the court distinctly told the jury, on behalf of the plaintiff, that a husband may act as agent for his wife in the control and management of the personal property of the wife, and if the property controlled by the husband, is, in fact, the property of the wife, then such control and management by the husband, does not alter the title to the property, and if they believed from the evidence, that the property in controversy was the property of Mrs. Gray, then, even if Gray did control and manage it, this did not make it the property of Gray.

We think, with these instructions before the jury, they could not possibly have been mislead by anything contained in the third instruction on behalf of defendant. Though the possession of the notes by Gray might be *prima facie* evidence of title in him, it was subject to be rebutted by other facts of the case, to which the attention of the jury had been specially directed by the instructions of the court.

The sixth instruction is as follows:

The court instructs the jury that although the notes given by Steere to Mrs. Gray, may have been in fact her own by a gift from Mr. Steere, yet if the jury further believe from the evidence that Mrs. Gray gave said notes to her husband, B. W. Gray, to trade upon, and expend and lay out as he thought proper, and that said B. W. Gray bought the billiard tables in question without any special understanding or agreement with his wife, Mrs. Gray, that the same should be done

in her name, then they became the property of B. W. Gray, as far as his creditors are concerned and were liable to the execution in favor of Ashley, and the jury will find for the defendant.

The appellant objects to this instruction, for the reason, as he understands it, that it asserts the husband may not act as the general agent of his wife in respect to the management of her separate property; and that unless specifically instructed, in respect to every detail and every item, he can make no purchase with the separate property of the wife as her agent, and that although her instructions may be specific, as to each and every item, yet if the property be purchased in the name of a third party, and with the assent of such third party, and not in the name of the wife, the property can be taken in satisfaction of the debts of the husband, by the husband's creditors.

We do not understand this instruction as countenancing the idea, that a married woman, possessed of a separate property, may not employ an agent to transact her business, either generally or in a particular case, and that she may employ her husband to act as her agent, is nowhere repudiated by the terms of this instruction. The wife must be careful to see that the husband is acting, in truth and in fact, as her agent and not on his own account. Very slight circumstances, may, in certain cases, be sufficient for a jury to infer that the property he is managing, is, really, his own and not that of the wife—that she has left it at his own disposal, abandoning her own control over it and bestowing it upon him. This she may do, and a jury will not require much persuasion, in a proper case, to induce them to come to such a conclusion. This instruction left the jury to determine, from the whole evidence, whether the money of Mrs. Gray was, or not, given to her husband for his purposes, or to be invested for the benefit of his wife. This was the question fairly before the jury by the instruction, and they have found,

and we think properly, the purchase of the saloon and billiard tables was an investment for the benefit of Gray, and with his own means. We say with his own means, because it is apparent from the testimony, that the notes of four thousand dollars, a part of which paid for this property, were the property of B. W. Gray, he and Steere having combined together to defraud his creditors by a sale to them of the stock of goods, at fifty cents on the dollar of their value, out of which, Steere admits, he made from two to three hundred per cent. over and above the cost. In equity and justice, the profits belonged to Gray's creditors and to Gray himself, a part of which he received through this pretended gift of four thousand dollars to Mrs. Gray. The whole transaction seems to us, an iniquitous one, by which, no person concerned, should be allowed to profit.

Another suggestion may be properly made. The witness, W. Doolittle says, that this property was bought by Gray for the plaintiff Brownell, who paid the money.

Mrs. Gray, in her evidence states, that after her husband's death, she sold out the whole establishment to the plaintiff, and took his notes therefor. The jury must have concluded from these different statements, that the appellant was a mere cover for Gray, and were warranted in believing the funds with which he was operating, were really his own, being his share of the proceeds of the fraud practiced on his creditors through the agency of Steere. The whole record shows a clear case against the appellant, and does not present such a case as the act of 1861 was designed to protect. The evidence fully sustains the verdict.

Perceiving no error in the instructions complained of, and no error in the record, the judgment must be affirmed.

*Judgment affirmed.*