## Sheffield Dyer

*v.*

## Julia Keefer.

1. Married Women—*separate property protected against debts of their husbands.* A married woman received from her father a draft for $150, payable to her order, with which to purchase a horse. She gave the draft to her husband to deposit in her name. Without her consent, her husband used this money, and to replace it turned over to her a horse, which, after keeping some time, she directed her husband to trade off, which he did for another horse. This latter horse the wife held under her undisputed control, the husband not using him without her consent, for nearly two years, when he was levied upon under an execution against her husband: *Held,* the transaction between the husband and wife appearing to be *bona fide,* the wife would be protected in her ownership of the horse levied upon, as her separate property, acquired, within the meaning of the act of 1861, from a person other than her husband.

Appeal from the Circuit Court of Lee county; the Hon. William W. Heaton, Judge, presiding.

The opinion states the case.

Mr. W. E. Ives, and Mr. B. H. Truesdell, for the appellant.

Messrs. Edsall & Crabtree, and Mr. N. H. Ryan, for the appellee.

Mr. Chief Justice Breese delivered the opinion of the court:

The only question presented by this record is, was the horse in controversy, the separate property of the plaintiff, acquired by her in good faith, during coverture, from a person other than her husband, by descent, devise or otherwise?

The proofs on this point are unmistakable. The plaintiff had been a married woman, the wife of William Keefer, several years, when, in February, 1867, her father sent her a

draft for one hundred and fifty dollars, payable to her order, with which to purchase a horse. She gave the draft to her husband to deposit with one Briggs in her name. Without her consent, her husband used this money, and to replace it, turned over to her a bay horse, which, after keeping some time, and he becoming sick, she directed her husband to trade off, which he did for the horse in controversy. The weight of evidence is, that this horse was not used by her husband without her consent, and that she exercised undisputed control over him from the spring of 1867, to January 20, 1869, when the constable levied an execution on him, issued against one John Stevens and her husband, on a judgment recovered against them by one Salmon Tuttle, in December, 1868. There is no proof going to show the nature of this debt, or when created, or the relation her husband stood to it, whether as principal or security; but that is not material.

It appears her husband had the horse shod, and fed him; she kept boarders and gave money to her husband to pay for hay. It is proved the plaintiff always claimed the horse, and exercised ownership over it.

It is claimed by appellant, that husband and wife are unable, by the common law, to contract with each other; that the statute of 1861 has made no change in this respect, and therefore, the bay horse having been the property of the husband, and exchanged for the horse in controversy, that became his also, and becoming his, was subject to his debts.

It cannot be denied the bay horse was the property of the husband; but who owned the draft for one hundred and fifty dollars sent plaintiff by her father? The answer must be according to the fact, the wife was the owner of it, and it came to her during her coverture, in good faith, by gift from one other than her husband. This, then, was her property most unquestionably. Not with her consent, the husband used this money for his own purposes, and to that amount became the debtor of his wife, and paid her by the bay horse. Suppose he had purchased the bay horse with the proceeds of the

draft, could there be any doubt about the ownership ?   What difference, then, if the bay horse was made the representative of the draft by means other than by purchase ?   The husband was justly indebted to the wife for the amount of the draft, and justice and honesty required he should satisfy the debt. If she chose to accept the bay horse, which she did, in lieu of the money received on the draft, it was her right to do so. The only objection we can perceive to this, if there be any objection, may be, that it makes the transaction somewhat suspicious, but the jury, by their verdict, have ignored *mala fides.*

The bay horse becoming the property of the wife, as the representative of the draft sent her by her father, and he being exchanged, by her direction, for the horse in controversy, it follows, that horse became her property and was not liable for her husband's debts.   From appellant's brief we infer, the bay horse was turned over to the wife before the debt accrued on which the judgment was had, and there is no proof any other debt existed, or any creditor to be defrauded ; that such a motive did not then exist to give origin to the transaction. It seems, from the evidence, to have been *bona fide,* and is within the principle of *Brownell* v. *Dixon,* 37 Ill. 197, where it was said a wife possessed of separate property may employ her husband as agent, to transact her business, either generally, or in a particular case.   And in *Sweeney and wife* v. *Damron et al.,* 47 ib. 450, it was held, a wife may intrust means, which she inherits since the act of 1861, to her husband, to loan or invest, and it will be protected in his hands to the same extent the money of a stranger would under like circumstances. This is decisive of this case, for it can make no difference that the wife received this draft for money, by gift from her father, and not by inheritance.

In the case before us, all the questions were fully presented to the jury by the instructions.   They properly declared the law of the case, and the evidence supports the verdict.   We must affirm the judgment.

*Judgment affirmed.*