# NANCY B. WALKER

## *v.*

# SARAH ANN CARRINGTON *et al.*

1. FRAUD — *proof of, against agent to avoid sale.* Where a conveyance of land is sought to be set aside, as having been induced by fraudulent representations of an agent, whose duties were advisory only, with no power to sell, the burden of proof lies upon ⸢the complainant to establish by clear and satisfactory proof that the agent acted in bad faith, and made material statements to the grantor to influence the sale, which he knew to be false, and that such statements influenced the sale.

2. SAME — *degree of proof as effected by lapse of time.* After the lapse of twenty years, when the principal parties to a transaction are dead, and it is sought to be impeached for fraud, the most clear and satisfactory proof of the fraud will be required to overcome the presumption of fairness and innocence.

3. SAME — *false representations must be relied on.* Where the representations of an agent, which are relied on to avoid a sale and conveyance, relate to the quality and value of the land sold, and it appears that the grantors, who were trustees, had actual knowledge of the facts from a personal inspection of the land, and by information from the husband of one and the father of the beneficiaries, it will not be presumed that the representations of the agent had any material influence upon their conduct as inducing the sale.

4. SAME — *sufficiency of proof.* Where an agent advised his principals, in the winter of 1850–51, of an offer of five dollars per acre for land, and stated that was the best offer that could be had, and advised a sale, proof that he was offered ten dollars per acre in 1848 will not, after the lapse of twenty years from the sale, be sufficient evidence to show actual fraud on the part of the agent.

5. MARRIED WOMAN — *husband may act as agent.* Where property is clearly that of a wife, her husband may act as her agent in its management, either by the appointment of her trustee, or, since the married woman's act of 1861, by her own appointment, and while his receiving the rents of her land may be viewed with suspicion, it is not conclusive evidence of fraud.

6. PURCHASER — *who may become.* The fact that a purchaser of land is a brother-in-law of an agent, even if the agent has power to sell, does not imply that confidence as to preclude him from becoming the purchaser of land, and much less so when the power of the agent is simply advisory.

7. FRAUD — *presumption against, after great length of time.* Although the acts and conduct of a party may be suspicious, yet if they can as well be attributed to honest motives, and may be as well consistent with fair dealing as with the reverse, they will be attributed to the former, especially after a great length of time, when it is extremely difficult to give a full and explicit explanation.

8. AGENT — *may acquire property after his trust is ended.* While it is true that a trustee or agent cannot be interested in a sale made by himself, yet when he has fully discharged his trust and sold property to a third person in good faith, having no interest in the same at the time, he may afterwards acquire the title from the purchaser, and such fact, or the fact that his wife acquires the title, will not afford ground for avoiding his sale.

9. LACHES — *to bar equitable relief.* Where a bill was filed to set aside a conveyance of land, twenty years after the deed was made, on the ground of fraud in the agent advising the sale, it was held that the claim was a stale one, on the ground of laches, and that this was a good defense in itself.

APPEAL from the Superior Court of Cook county ; the Hon. JOSEPH E. GARY, Judge, presiding.

This was a bill in chancery, by appellees against appellant and one Cyrus Bentley, charging that appellant holds certain land in trust for appellees, and praying that she be decreed to convey title in the same, etc.

A brief statement of the facts alleged in the bill, shows, that Charles Walker, now deceased, in his lifetime, and on the 7th day of May, 1841, being the owner of a certain quarter section of land in the town of Jefferson, in Cook county, which is the land in controversy, together with his wife, the appellant, conveyed the same by deed to one Eliphalet Terry, of Connecticut, who is also now deceased. Eliphalet Terry, by his last will and testament, bequeathed $1,500 to Seth Terry, his brother, and Charles Boswell, in trust for his sister Mary, and directed that on her death it should be divided among his four children, one of whom was the appellee Sarah Ann Carrington, and that her interest should be held in trust by said trustees. He also bequeathed to the trustees $5,000, to pay the income to the appellee Sarah Ann, for life, and at her death to divide the principal equally among her children. The residuum of his estate he directed should be divided into four equal parts, one of which he bequeathed to the trustees for the use of the appellee Sarah Ann, upon the like trust as the $1,500. He also gave the trustees full power and authority to sell and convey the real estate.

Eliphalet Terry died in July, 1849, and his will was properly proven and admitted to probate.

The appellees Edward and Sarah Ann Carrington are hus-

band and wife ; and the other appellees, Catharine, Sarah and Edwin T. Carrington, are their children.

On the 17th day of September, 1849, the heirs at law of Eliphalet Terry united in a deed conveying to the trustees named in his will, the property in controversy, in trust, to hold the same for the use of appellee Sarah Ann and her children, with power to sell and convey the same.

After Walker conveyed the land to Terry, he continued to look after it, as Terry's agent, and was authorized to ascertain if he could make sale of it. This continued until some time ia 1847, when his agency was withdrawn.

After the death of Terry, and in 1850, the trustees appointed Walker as their agent to look after the land, and assist them in making sale of it. The appellee Edward Carrington, who resided in Connecticut, was also, to some degree, assisting the trustees, and had some correspondence with Walker in regard to the sale of the land. On the 17th day of July, 1850, Walker wrote him he had made inquiry about the property and could find no one to make an offer except Mr. Bentley, who had made an offer two years before. He proposed to negotiate with Bentley and others, for the sale of the property, and informed them that Bentley would like to know if his offer was accepted, so as to purchase elsewhere if rejected. The terms proposed from Bentley were $600, in cash, or $200 in cash and the balance $200 in one year, $200 in two years, and $200 in three years from date. Walker also, in that letter, advised Carrington, if they wanted to sell, the offer was a fair one, as not more than half of the property could ever be plowed, that the balance was very wet, and that the railroads made lands twenty miles from the city, (Chicago,) worth more than this, in consequence of having to go from it to the city, a distance of six or seven miles, by wagon.

On the 18th of November, 1850, Walker again wrote to Carrington that Bentley would take the land as he had offered, adding:

"My opinion is, if you wish to sell, you had better take it.

I find there is more of the low marsh than I supposed. The prairie all lies vacant out there, so wet the farmers do not like to settle, and it will be a good many years before one-quarter will be occupied, and forty to sixty acres of it will cost the value of the land to drain it; you will do no better with him. I so understood the offer the first time. If you wish to hold, you may do better in five or six years, but at this time there are two or three one hundred and sixty acres in that neighborhood offered at five dollars per acre, on five years' credit, with no buyer. If you make up your mind to take the offer, I will close the contract with him, or you may make out a deed and send it, and I will see to all the securities, and send you the money paid."

The trustees authorized the trade to be accordingly closed with Bentley, executed and forwarded to Walker the proper conveyance, which bears date March 10th, 1851, and in due time Walker returned to them Bentley's notes and mortgage to secure the deferred payments.

On the 19th of February, 1868, Bentley, by deed, conveyed the land to appellant.

Charles Walker died in June, 1868, leaving appellant his widow.

Terry and Boswell resigned as trustees on the 14th of October, 1851, and Jared Deming was appointed their successor. Subsequently he resigned, and appellee Edwin T. Carrington was appointed his successor.

Seth Terry died in 1865 or 1866.

The bill charges that the representations made by Walker, in his letter of the 18th of November, 1850, were false, and known by him to be so when made; that the trustees placed entire confidence in these representations, and believed them to be true; that appellees have, within a recent period, discovered that the sale was made by and through Walker, as agent of the trust estate, really to and for appellant, his wife, or for himself; and that he or his wife was the real party purchasing, and paid the purchase money, and not Bentley. It

further charges misrepresentation and design upon the part of Walker, in the letters and correspondence, to mislead the trustees touching the value of the property; that at the time of the sale it was, to Walker's knowledge, worth from $2,500 to $3,000; and that the trustees believed Walker to be acting in good faith, and relied solely upon the truth of his representations, as contained in his letters, in making the conveyance. It is also denied that either the trustees or appellees had any knowledge that Bentley was purchasing for Walker or his wife, but they were induced to and did believe, from Walker's representations, that Bentley was buying for himself.

It is also further charged by the bill that appellees and the several trustees are, and have been since the execution of the deed to Bentley, non-residents of the State of Illinois, and unacquainted with the value of lands in Cook county.

The answer of appellant and Bentley admits the conveyances by the trustees, Terry and Boswell, to Bentley, and by Bentley to appellant; alleges that Bentley, for the period of seven successive years, and from his purchase until his conveyance to appellant, was possessed of the land by actual residence thereon by tenants, and having a connected title in law, deducible of record from the United States; that from and after the conveyance by Bentley and wife to appellant until the filing of appellees' bill, and during all that time and for more than seven successive years next before the bringing of the suit, Bentley and appellant, as his assigns, were possessed of all and singular the said land and premises, by actual residence by their tenants respectively and continuously, — having a connected title at law and in equity, deducible of record from the United States and that at the time of exhibiting the bill, and for a long time previously, appellant claimed to be, and was, and still is, the legal and equitable owner of said premises; and they severally further set up the provisions of sections 8, 9 and 10 of chapter 66 of the Revised Statutes of 1845.

The answer further alleges, that, respecting the pretended

rights and claims of the appellees, and the several matters and alleged grounds of relief stated in their bill, appellant is the legal and equitable owner of the premises for a valuable consideration, and in good faith, without notice of the matters alleged in the bill, and that the matters on which appellees pretend to found their supposed right in the premises occurred near twenty years before the filing of the bill; that since that time the said Charles Walker has died, and that they are unable to make proof as to what he did or did not communicate to the parties who sold and deeded the premises to Bentley; that the said transactions have, long since, become and are obscured by lapse of time, and that the alleged rights of appellees are stale and antiquated; and that appellees ought, consequently, to have no relief, etc.

The answer further denies all charge of fraud, etc., and all other allegations of the bill.

The court decreed in favor of the appellees.

The errors assigned are:

1. That the court erred in not dismissing the bill of complaint of the said complainants.

2. That the court erred in decreeing relief to the complainants upon the evidence in this case, and in not dismissing the said bill of complaint out of court.

Messrs. LAWRENCE, WINSTON, CAMPBELL & LAWRENCE, and Messrs. AYER & KALES, for the appellant.

Messrs. LYMAN & JACKSON, and Mr. E. A. SMALL, for the appellees.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

Appellees charge both actual and constructive fraud upon Charles Walker, while acting as agent for the trustees, Terry and Boswell; and it is essential to the success of their claim that it shall appear that either actual or constructive fraud is clearly proved.

Walker had nothing to do in determining that the land should be sold, the time when the sale should be made, nor the price for which it should be sold, any further than his advice may have affected the trustees in these respects. He was employed to look after the land and find a purchaser for it. The discretion of determining whether and when the land should be sold, and, if sold, at what price, was vested in the trustees, and there is no proof that they attempted to delegate any portion of this discretion to Walker. His duties were simply advisory; and the charge made imposes the burden on appellees of establishing, by clear and satisfactory proof, 1st, that he acted in bad faith and made material statements to the trustees to influence the sale, which he knew to be false; and 2nd, that they, in making the sale, were influenced by those material and false statements. In examining the evidence it is proper we should take into consideration that the suit was not commenced until nearly twenty years had elapsed after the transaction which is to be investigated; that more than that time intervened the taking of much of the evidence and the occurrences to which it relates, and that Walker, whose conduct is sought to be impeached, and Terry, the trustee who acted most prominently in the transaction, had both been dead for several years before the bringing of the suit was contemplated. If, indeed, it is clearly established there was fraud as charged, and that the knowledge of it was concealed from appellees, these circumstances may be of no importance; but they are quite important in determining whether the fraud charged has been sufficiently proved. The observations of Mr. Justice STORY in *Prevot* v. *Gratz*, 6 Wheat. 497, 498, in discussing the sufficiency of evidence introduced to prove fraud, under like circumstances, are quite as pertinent here as they were there. He said: " But length of time necessarily obscures all human evidence; and as it thus removes from the parties all the immediate means to verify the nature of the original transaction, it operates by way of presumption in favor of innocence, and against imputation of fraud. It would be unreasonable,

after great length of time, to require exact proof of all minute circumstances of any transaction, or to expect a satisfactory explanation of every difficulty, real or apparent, with which it may be incumbered. The most that can fairly be expected in such cases, if the parties are living, from the frailty of human infirmity, is, that the material facts can be given with certainty to a common intent, and, if the parties are dead, and the case rests in confidence, and in parol agreements, the most we can hope is to arrive at probable conjectures, and to substitute general presumptions of law for exact knowledge. Fraud or breach of trust ought not lightly to be imputed to the living; for the legal presumption is the other way; and as to the dead, who are not here to answer for themselves, it would be the height of injustice and cruelty to disturb their ashes, and violate the sanctity of the grave, unless the evidence of fraud be clear beyond a reasonable doubt."

The representations made by Walker, which are claimed to be fraudulent, are found in certain letters written by him in regard to the sale of the land, and particularly in two addressed by him to Edward Carrington, who was corresponding with him on behalf of the trustees, in which he represented that he could find no one to make an offer for the property except Bentley, who proposed to purchase it at $600 cash, or $800 in payments of $200 in cash, $200 in one year, $200 in two years and $200 in three years; that if they wanted to sell, the offer was a fair one; and, in the last of these letters, which was written on the eighteenth of November, 1850, the following was added:

" The prairie all lies vacant out there, so wet the farmers do not like to settle, and it will be a good many years before one-quarter will be occupied, and forty to sixty acres of it will cost the value of the land to drain it. You will do no better with him. I so understood the offer the first time. If you wish to hold, you may do better in five or six years; but at this time there are two or three one hundred and sixty acres in that neighborhood offered at five dollars per acre, on five years'

credit, with no buyer. If you make up your mind to take the offer, I will close the contract with him," etc.

It appears from the evidence that Edward Carrington and Seth Terry had both been upon the land before the sale, and must, therefore, have had a personal acquaintance with its location, and some general idea of the quality of the soil, and what proportion was probably wet and what dry land. Carrington says he was in Chicago in 1845 and in 1846, and he subsequently corresponded with Walker in regard to the sale of the land, in the lifetime of Eliphalet Terry, and several years before his correspondence with him was resumed on behalf of the trustees. In the letter from Walker to him, from which we have quoted, Walker makes direct reference to Carrington's having been with him on or near the land, in these words: " I find there is more of the low marsh than I supposed when you and myself were out there." Noble says he had an introduction to a man by the name of Terry — don't know what his first name was. * * " The introduction was made by Charles Walker. Terry and Walker were then upon the property together; that is, the property in this suit. It was some time in the summer. * * * I made a bargain with Terry for the grass on that same ground. Nothing was said by Terry about selling it. He had only purchased it a little time before that, or something about then. That was as I understood," etc. He also says it was in the neighborhood of twenty years before the time he was giving his evidence. It is not pretended that Eliphalet Terry visited the property, and the reasonable inference is that the Terry alluded to was Seth Terry, the trustee, and the time subsequent to the death of Eliphalet Terry in 1849, and before the negotiations for the sale in the fall of 1850.

So far, then, as the trustees had actual knowledge from a personal inspection of the land, and by information from Edward Carrington, who was husband of one and father of the other beneficiaries, it is not to be supposed the representations of Walker had any material influence upon their conduct.

Seven witnesses were introduced by appellees, who testified the value of the land was, at the time of the sale, ten dollars or more per acre.

But one of these, however, Gray, testified to any circumstance tending directly to show knowledge in Walker that the land was of that value. He says he endeavored to buy it of Walker in 1848; that he called on Walker and inquired if he was the owner of the property. Walker said he was. Witness asked him if the property was for sale. He said it depended on what he could sell it for. He finally made a conditional offer, and in respect to this he uses this language: "I did not consider it binding on his part, or on mine, to sell it for ten dollars an acre. I afterwards called, and he told me it was not for sale."

We are inclined to the belief that the witness, though doubtless actuated by honest convictions, is mistaken — most probably by assigning the conversation to too early a period by several years. It is apparent that such a mistake might well occur — and, indeed, it is matter of common observation that they frequently do occur, where the period over which the memory is required to extend is much shorter than it was here. A quarter of a century had elapsed between the time of the conversation and the time at which the witness was called to testify. The conversation had been productive of no practical result, it appears to have been in no way connected with any important event which we can suppose would be indelibly imprinted on the memory; and it is not shown that there was, during this long time, any occasion for recalling or reviving the recollection of the conversation. It is exceedingly improbable that Walker should have held such a conversation in regard to the land, at the time stated by the witness.

It is shown by the evidence that Walker sold and conveyed the land to Eliphalet Terry in May, 1841; that he acted as Terry's agent in looking after it and trying to get a purchaser for it, until Edward Carrington, becoming dissatisfied with him, had his agency withdrawn; and there is no pretense that he

had any thing to do with the land between that time and his subsequent appointment by the trustees in 1850. Carrington says "I became dissatisfied with his management of it [the land] and withdrew the agency from him." The last letter in evidence from Walker to Carrington, written in the lifetime of Eliphalet Terry, and which, from other evidence, seems to have been the culminating cause of Carrington's dissatisfaction, bears date Sept. 20, 1847. That the withdrawal of the agency followed this letter, at least before the end of the year, is clearly shown by a subsequent letter written by Walker to the trustee, Seth Terry, dated the 21st of February, 1851, in which, after alluding to a certificate of purchase that had been given to Farwell on a sale of the land for taxes, he says: "I succeeded in buying the certificate, and got it assigned to me. This mistake is because Mr. C. took it out of my hands in 1847," etc. No rational motive is shown, and none is perceived, why Walker should have professed to be the owner of land, over which he did not even have an agency, when he must have known that the records would have disclosed to any one examining them the true state of the title. Had his purpose been to cheat or defraud thereby, it is natural to suppose some attempt would have been made to do so. He is made to appear to tell a falsehood without an apparent purpose, and to encourage negotiation merely for the pleasure of breaking it off.

But, aside from this, it does not follow because Gray may have offered Walker $10 an acre for the land in 1848, Walker knew he was advising that it be sold for less than it was worth, in the fall and winter of 1850, '51. It is not shown that Gray, or any one else, at that time offered $10 an acre for the land, or that any one, other than Bentley, was willing and desiring to buy it at any price. Walker may then have forgotten Gray's offer, or, if recollecting it, may have been unable to find any one who would make as good a one. This is a charitable and reasonable presumption which the law requires us to indulge, unless it is inconsistent with the clearly proved facts.

As illustrative of the liability of persons in fixing an estimate

58—74TH ILL.

458        WALKER *v.* CARRINGTON *et al.*        [Sept. T.

Opinion of the Court.

of value, at a period of time far remote from that at which the value is desired to be ascertained, to deceive themselves by mis-applying dates, we may allude to the evidence of Noble who gives it as his opinion the land at the time of the sale was worth from $20 to $25 per acre. In giving his means of knowledge of the value of real estate in the vicinity, at the time, he says: " Knows of two sales before that, one was by Hayes, the other by Wells. Wells sold ten acres to Clybourn for about $18 an acre in 1847 or 1848, and Hayes sold for $22 an acre, he thinks in 1848 or 1849." He also says, in a previous part of his evi-dence, that he himself sold to Mrs. Chapron ten acres of land for a thousand dollars in 1852 or 1853.

Now Mrs. Chapron swears, and the abstract of title confirms her, that the sale by Noble to her, instead of having been made in 1852 or 1853, was made on the 28th of November, 1855.

Hayes swears he was not in that country until in January, 1851, and he owned no land in Jefferson until in 1852 or 1853; that he purchased a quarter section there as late as 1853.

And J. H. Clybourn swears the property sold by Wells was to his brother, and that the sale was not made until in 1863.

There were six witnesses who testified on behalf of ap-pellant, that gave it as their opinion, in substance, that the land at the time of the sale was worth no more than Bentley paid for it. All of them, although not, as most of the witnesses for appellees were, residents of the town of Jefferson, were familiar with the value of real estate there in 1850–51, and knew the land in controversy. Some of them were, during those years, largely engaged in buying and selling real estate in the town of Jefferson.

As a reason why lands were cheap in that vicinity at the time, they show that government lands could be bought in that country, although not in that town, with land warrants, at less than one dollar and a quarter an acre. Chicago did not have a population exceeding twenty thousand; the streets of the city and the roads leading into it were in bad condition; there was

.no gas, and but an inadequate supply of drinking water; adjacent to the city, and in almost every direction, there were large tracts of land covered with water, and the country between Chicago and Jefferson was chiefly low, wet prairie, unfit for general agricultural purposes without expensive drainage.

Mahlon D. Ogden, whose firm was doing a very large real estate business at that time in this town, as well as elsewhere in the county, says: " The country at that time leading to Jefferson was what we considered very low, swampy, marshy land; roads bad, a great deal of land not fit for cultivation without large drainage." He also says, in 1849, 1850 and 1851, sales were very slow, not easily made, except to parties who wanted to occupy; no speculation. In 1851, 1852 and 1853 prices took an upward turn, and went on better up to 1856, when they got high, and in 1857 they went low again.

Herbert, who was tenant on the land to appellant from 1858 to 1859, says when he went there no improvements were on the land, except the street or road. There were forty-five or fifty acres of what he calls dry, tillable land, about forty acres of slough, and the balance was fit for cutting grass, and some parts of it for pasture. The land being lower than other lands around it, was flooded by the water flowing from them.

We cannot take the time to quote the evidence of all the witnesses in full. It is sufficient that, after a careful perusal of the entire evidence, in which we have not confined ourselves to the abstract alone, we are clear in the conviction that the charge of fraud is not proved with that degree of certainty the law requires, in view of the death of Walker and the lapse of so great a time.

If the question were simply, does the evidence preponderate that the value of the land was, at the time of the sale, greater than that for which it was sold, our conclusion might be otherwise. But, while such a preponderance tends to show Walker did know the value of the land was greater than he represented it to be, it is by no means conclusive on that ques-

tion. So many circumstances affect the value of lands which different minds may look at in different ways, that it would be grossly unjust to condemn an estimate as fraudulent, merely because more persons should be found to say it was too low than that it was fair and reasonable. Of those who are found sustaining the estimate of Walker, there are several men of large experience in real estate transactions, who were well acquainted with the land in controversy, and familiar with the value of land in its vicinity at the time the transaction occurred, and there is no attempt made to impeach the honesty of their motives or the sincerity of their convictions. It is impossible to say, from what appears in evidence, that Walker may not have been equally honest and sincere in his estimate of the value, and if so, even if inaccurate, his representations were not fraudulent.

The great misfortune, as it seems to us, resulted to appellees from the determination of their trustees to sell at an inopportune time. Had they waited, as suggested by Walker, four or five years; or better still, twenty or twenty-five years, it would have saved them what they now feel they have lost. But with that Walker had nothing to do. There is no evidence showing that he influenced the trustees, in the slightest degree, upon that question.

But it is charged that Walker was interested in the sale to Bentley, and therefore, although he may have been guilty of no actual fraud, the sale was fraudulent in law. This, like the preceding question, depends entirely upon the evidence.

It has already been observed that Walker conveyed the land to Eliphalet Terry on the 7th day of May, 1841, and his subsequent agency in regard to it needs no further explanation. The deed by the trustees to Cyrus Bentley was made on the 24th day of April, 1851, and Bentley conveyed to appellant on the 19th day of February, 1868. Bentley was a brother-in-law of Walker, and brother of appellant.

In a letter written by Bentley on the 11th of May, 1870, and addressed to Jared Deming, who was for a time trustee

for appellees, for the purpose of having a formal release of the mortgage which he had given to secure the deferred payments for the land executed, he used this language: " Mrs. Charles Walker (widow of Charles) is the owner of this land, I (her brother) held the title in my own name for her and gave the notes and mortgage for part of the purchase money when the land was purchased of Messrs. Terry and Boswell. Mrs. Walker being now about to sell some of this land, the purchaser desires that the mortgage may be released from the records."

This, the appellees allege and swear, was the first notice they had that appellant had any interest in the land; and it undoubtedly led to the filing of the bill.

Appellant and Bentley were both examined as witnesses and their testimony, together with the letters of Walker and Bentley, constitute the entire evidence on this branch of the case.

Appellees claim that the proof is complete that when the sale was made it was in fact to appellant, and that Walker knew it when he recommended the sale to Bentley. There is no admission of any thing like this in the letters of Walker, and the only thing claimed to have that effect in the letters of Bentley is what we have quoted from his letter of May 11, 1870, to Deming.

This, in our opinion, is not an admission that when he purchased he was purchasing for appellant, but simply that he held the title for her as trustee. When he commenced to hold as trustee he does not say. It is consistent, it is true with the idea that he held it all the time as trustee, yet we do not think it is inconsistent with the hypothesis claimed by appellant, that some little time after the purchase, by an arrangement with her, it was determined that she was to have the land, and that he should hold it for her. The language of the letter is equally as true under that hypothesis as the other. Indeed, in view of the fact that the letter seems to have been unreserved, and perfectly frank, in detailing the history of the transaction, it would seem to have been more reasonable, if the purchase had

been in fact made for appellant, that language would have been used.

Bentley was twice examined as a witness, once by appellees and once by appellant. In his first examination he said he could not say, when he made the offer, whether he bought the property for appellant or himself. After the purchase was made, or at the time of its consummation, he determined it should be for appellant.

In reply to this interrogatory — " When did you first tell him (*i. e.* Walker) you had concluded to purchase for his wife ? " — he answered : " I cannot remember positively, but my impression is, after he had delivered me the deed and I gave him the notes and mortgage for the deferred payments, and was asked for the first payment. Could not state that before the sale was completed I did not inform Walker I was purchasing the property for his wife. I might have done so, but have no recollection of doing so, and my best impression is I did not; nor do I know whether Mrs. Walker did or did not know I was going to purchase the property for her. I have no recollection of having any conference with her on the subject, and, according to my best recollection, I acted on my own judgment and discretion in the premises, as I have done in making investments for her."

Again, in answer to a subsequent interrogatory, whether he did not inform Walker before the sale was consummated that he intended to purchase the property for appellant, he said : " I cannot, at this length of time, state what I did not do. I can only state that my impression is that I did not until the sale was consummated."

Upon being, at a subsequent day, examined on behalf of appellant, he said : " I have felt delicate in this matter about testifying to any thing very positive that transpired so many years ago, but since giving my deposition I have thought a great deal about it, trying to refresh my memory in various ways, and I cannot recall a single instance or circumstance that leads me to think or believe that I bought the property for Mrs.

Walker. I had bought property of Mrs. Walker for myself before. I recollect in this matter of the defective acknowledgment, I insisted to Mr. Walker that if I took this property, he and his wife must make a quitclaim deed to me, to correct this defect in the acknowledgment of Mrs. Walker, and he promised to do so. I insisted upon this at the time the abstract was prepared, and when I was in treaty for the property."

Appellant testified: "I have a remembrance that my brother, Cyrus Bentley, made a purchase of the land in question; remember having heard that he had bought it; remember Mr. Herbert, who lived in Chicago about that time. He was a brother-in-law of Mr. Walker. I recollect of going out in company with Mr. and Mrs. Herbert to view this land. It was after I had heard that Cyrus Bentley had bought it. I cannot say exactly what time of year it was, but think it was either in May or June of 1851. I fix the date in this way: it was not very long before my husband's sickness in that year; he was sick in August, 1851, of the cholera. The circumstances under which I came upon the ground at that time were, that my husband said to me he thought he would like to have me go out, together with Mr. and Mrs. Herbert, to see the land. Whether I was then owning, or whether I was to have it, it was my impression that he took me out at that time with Mr. Herbert to see what they would think of it; that it was perhaps optional with me whether I would have it or not."

And again she said: " I had an impression something like this: My brother thinks he can do better than to hold this land, and, therefore, he turns it over to me. * * I remember, some time after this, my brother saying to me, 'I rather think I missed it in letting you have this land; I had better kept it.'"

In answer to the question whether she and her husband had any conversation relative to Bentley's buying the land for her, she said: "I never recollect his talking with me at all. I remember of no conversation upon the subject relative to having

464      Walker *v.* Carrington *et al.*     [Sept. T.

Opinion of the Court.

an interest in the property prior to May or June, 1851, at the time I went upon the ground. That was the first of my knowing or thinking, and I know of no conversation prior to that time, in which I was to have an interest in the property."

This evidence, standing alone, cannot be regarded as sufficient to prove that Bentley, at the time he purchased, was purchasing for appellant, or that Walker, when he recommended the sale, supposed that his wife was interested in it.

There are, however, a number of other circumstances which, it is claimed, should be taken into consideration, which are inconsistent with the idea that Bentley purchased for himself.

In a letter written by Bentley on the 23d of September, 1870, to Edwin T. Carrington, one of the appellees, who was then trustee for his mother and sisters, in regard to the property bequeathed by his grandfather, Eliphalet Terry, in alluding to the notes and mortgage executed to Terry and Boswell for the deferred payments on the land, he says: " These notes were all paid through Charles Walker, who attended to the business, and when Mr. Walker paid the last note I supposed he got a release of the mortgage given on said .one hundred and sixty acres to secure said notes. Mr. W. died a couple of years since, and we find, since his death, no release of said mortgage on record, and conclude if he obtained a release he neglected to record it, and the same is lost."

Bentley, in giving his evidence in his first examination, also said: " As to the property in question, I had no active control of it, except to visit it occasionally, and to know who occupied it, and what improvements were made upon it. Mr. Walker had the principal charge and management of it by an arrangement with me. For several years the property was not occupied, except that parties had the privilege of cutting hay for a compensation ; afterwards it was improved and leased. Mr. Walker gave them the privilege and received the compensation, and accounted to Mrs. Walker for the proceeds, keeping an account upon his books, and the books of the several firms of which he was a member, in the name of Mrs. Walker. I

know this was done, and saw the accounts, and examined them upon the books myself.  *  *  *  Primarily, Walker and his firms received the rents and profits, and Mrs. Walker had the benefit of them."

Transactions of this kind are always viewed with suspicion; still, where the property is clearly the property of the wife, the husband may act as her agent in its management, either by appointment of her trustee, or, since the act of 1861, relating to the separate property of married women, by her own appointment. *Brownell* v. *Dixon*, 37 Ill. 197; *Wortman* v. *Price*, 47 id. 22; *Pierce* v. *Hasbrouck*, 49 id. 23; *Dean* v. *Bailey*, 50 id. 481.

It appears from the evidence of Bentley that appellant had an estate coming to her from their father, which she was desirous should be preserved for her, separate from the property of her husband, and in 1849, at her request, and with the consent of Walker, he became her trustee for the management of this estate. The agreement was by parol merely; but Bentley, from thenceforth until since Walker's death, acted as her trustee, and no objection has ever been urged against the mode of his appointment.

He swears that on the ninth of September, 1849, he loaned Walker, for the use of his firm, Walker & Clark, $1,010, on which interest was to be paid at the rate of twelve per cent per annum, of appellant's money. This was the proceeds of two notes, which their father had executed to appellant many years before, in renewal of notes which he had given her before her marriage. The impression of the witness is, after Walker delivered him the deed to the property, and he had given the notes and mortgage, and when he was asked for the first payment, he informed Walker that the purchase was made for the appellant, and directed him to apply the amount due from himself on account of the money borrowed from witness belonging to Mrs. Walker, in payment of the notes. He further says, as a reason for appointing Walker agent to look after the land, he felt that, inasmuch as he was not proposing to

59—74TH ILL.

charge any thing for his own services, and was engaged in the active practice of the law, while Walker was engaged in business which rendered it not inconvenient for him to discharge the duties of the agency, and was, moreover, the husband of appellant, it was not unreasonable to ask him to assume whatever of burden there was in the matter. It does not appear that there was any circumstance to cause him to doubt Walker's competency so to act, or the prudence of his selection. He says Walker was a man of high character, he had had many business transactions with him and never had cause to doubt his integrity. That Walker owed the money to Bentley, as trustee for appellant; that it was agreed he should discharge the debt by paying the notes given by Bentley; and that he, as trustee of appellant, in good faith, accepted the payment of the notes as a payment of the debt due from Walker, can only be doubted by discrediting Bentley's positive and uncontradicted testimony. There is no pretense that the notes were not paid, and the circumstance of the neglect to obtain the release of the mortgage is evidence of negligence merely, and as consistent with the good faith of the transaction as with its opposite; indeed, it would seem more probable, if bad faith had existed, greater care would have been used to have avoided every pretext for a subsequent examination into the transaction, than if there had been no consciousness of danger to be apprehended from that source.

We are unable to perceive any thing so unreasonable in the nature of the fact testified to by Bentley, in this respect, as to raise a presumption against his veracity. On the contrary, we think they are capable of being reconciled as consistent with good faith in all the parties concerned in the transaction.

The relationship, of itself, does not imply such confidence between Walker and Bentley, even if the former had been the trustee to sell, as would preclude the latter from becoming the purchaser of the property.

Bentley says: "I cannot remember when my attention was first called to the fact that the property was for sale. It was

sometime before I purchased    *    *    *    *    *
*    *    *    *    *    *    Walker told me where the
land was, and said something about the quality of it.  As to
the value I can't remember particularly what he said, but my
impression is that he gave it as his opinion that the land was
worth about $5 an acre on a reasonable time for the payment of
it.   *   *   My impression is he expressed the opinion that at
that price it might eventually prove to be a good investment;
but he did not give it as his opinion that it would be a good in-
vestment at that price, with a view to converting it and turn-
ing it into money again in a short time, or until the lapse of
years.

"Regarding my reasons for making the purchase, I think
after a conference with others, though am not positive about it,
I came to the conclusion that it would be a good investment,
after the lapse of years, and as I had money that I could invest
permanently, without needing it again for years, I was induced
to purchase it; I do not remember previously to have visited
the ground or land, but relied on Walker's statement as to the
situation and character of it, and I think I traced it on a map."
This is all there is in the evidence showing that Bentley pur-
chased under Walker's advice.

We discover nothing here which is necessarily inconsistent
with fair dealing.  The object of Walker's agency was to find
a purchaser for the land, and what he said to Bentley is no
more than might have been said to any other possible purchaser.
He did not represent that the land could be obtained for less
than it was then worth, and his conjectures as to the profits to
be derived in the future from buying and holding it, in no
wise affected the duty he owed to the trustees.  There is noth-
ing in the language from which we can infer he was intending
his wife should have the land; and Bentley's evidence is ex-
plicit that he was ignorant of what Walker wrote to the trus-
tees in regard to the sale ; that there was no conversation be-
tween Walker and himself, or between anybody and himself,
for the purpose of regaining the property either from Walker

or his wife; and he adds: " I acted independently of Walker, and on my own judgment and responsibility, in making the purchase, and not until after May 11th, 1870, did I hear any allegations of fraud, nor had I the slightest conception that anybody supposed there had been any in the sale and purchase of this land; nor do I know of any unfairness or concealment having been practiced by any person or persons."

It appears from the letters of Walker to Edward Carrington, in evidence, that on the tenth of July, 1847, Walker wrote him: " I yesterday by contract sold your lot to William N. Bentley, Jr., for $600, to be cash within six months, and probably all down. Mr. Bentley has found a customer for it by the name of William D. Knapp. I have got of the money, so as to make it sure, etc., and he directs the deed had better be made to Knapp."

In a letter written to the same person on the twentieth of September, 1847, Walker informs him that the man with whom Bentley made the conditional bargain will not pay $800, but will pay $750 and no more, and closes by advising him to take it. It was after the receipt of this letter that Carrington caused Walker to be removed as agent, as we have before shown.

In the letter written by Walker to Carrington on the seventeenth of July, 1850, he informs him that he has made some inquiry, and can get no one to make an offer for the land except Mr. Bentley, who, he says, was the person that first made the offer two years before.

In a subsequent letter Walker says: " Bentley's name, the purchaser of the land, is Cyrus."

Bentley made an abstract of title before closing the purchase, from the records of Cook county, in which it appeared that in the certificate of the acknowledgment of the deed from Walker and wife to Eliphalet Terry the name of Walker's wife was given as Mary instead of Nancy B. This seems to have been an error of the recorder only, but it does not appear to have been known to either Bentley or Walker at the time, and

there was no certificate that the acknowledgment, which was taken in the State of New York, was in conformity with the laws of that State. The land had also been sold for taxes to Farwell.

These objections were pointed out by Bentley to Walker; and in a letter written by Walker to Seth Terry on the twenty-first of February, 1851, he used this language: "It has taken me a long time to get Mr. Bentley to examine the title to the land sold, as he was full of professional business. I found it was sold and past redemption, and lost, if Mr. Farwell had not been my particular friend. I succeeded in buying the certificate, and got it assigned to me. * * * I see that my deed is informal to Mr. Terry, but I and my wife can quitclaim it to Mr. Bentley, which will cover the tax title and all.

"Mr. Bentley shows you how you must deed to have the deed good, and you will please make out the papers accordingly, in strict compliance, and forward," etc.

From these letters and circumstances, appellees' counsel insist these conclusions are to be deduced: First, there was, from the first letters, written by Walker to Edward Carrington, a design to repossess himself of this land, either by getting the title in his own name or in that of his wife; and secondly, to conceal all knowledge of this design from the trustees.

The name of Knapp, they claim, was a myth, and Bentley was to be used to assist him in accomplishing his design. The letters, it is argued, show great artifice and adroitness in representing the difficulty of selling the property and in magnifying trifling objections to the title, etc., so as to reconcile the trustees to the sale and satisfy them with the small price for which it was sold.

It seems to us this line of argument assumes what it devolves upon appellees to prove. If we shall assume that Walker was, all the time, laboring to get the title to the property in himself or in his wife, and that he used Bentley as a mere instrument to accomplish his end, we may discover much adroitness and skill in the artifices to which he resorted.

But does the evidence necessarily tend to prove that such was his design?

If it is susceptible of an explanation, equally reasonable, consistent with the fidelity and good faith of Walker as a trustee, we must adopt it.

Appellant had a brother named William N. Bentley, who died in 1852, and appellant says she heard her husband talking with him about the land, but she recollects of no conversation relative to her having an interest in the property. Cyrus Bentley says that in 1847 his brother William N. lived in Beloit, but was frequently in Chicago, and between 1847 and 1850 was engaged in frequent real estate transactions with Walker. There appears, therefore, no insuperable difficulty to his having made the offer represented; nor, if made, why it should not have been made in good faith. But who was Knapp? Walker and William N. Bentley, if alive, might tell. It surely cannot be regarded as strange or suspicious that William N. Bentley, twenty-five years before this evidence was taken, knew a man to whom he could have sold the land, yet who is unknown to the witnesses who have testified. It is not shown there could have been no such person; and in the absence of such proofs the presumption must be, especially after the lapse of the great length of time that has intervened, that the representation was correct.

The fact that Walker alludes to Cyrus Bentley as the same person who had made the offer two years before, we think of no importance. It was, manifestly, a mistake of his, resulting, probably, from the fact that both were brothers of his wife. But of what consequence was it, in the view claimed by appellees, whether the last offer was made by the same person who made the former offer or not? It does not appear that it would have been less objectionable to the trustees to convey to Cyrus than to William N.

And as between persons occupying an apparently equally indifferent relation to the trust, the only question of importance to them was evidently the price that was proposed to be paid.

So far as the objections urged by Bentley to the title are concerned, we think they are precisely such as would have been urged by any cautious and prudent man in purchasing for himself.

That they were easily removed does not materially affect the question. The record showed their existence, and it was but the part of prudence to require that they should be corrected before title was made and the transaction closed. It is, to our mind, much more reasonable that, if he had at the time known that he was purchasing for appellant, he would have made no objection to the acknowledgment of the deed, so far as her name was concerned, knowing that it would be wholly immaterial.

It is insisted, waiving the question on the evidence, and conceding that Bentley, in fact, purchased for himself, yet inasmuch as appellant shortly thereafter became invested with an equitable interest in the property, in which Walker, by virtue of his marital relation, had rights, the sale was void, because, it is argued, a sale made by an agent is invalid when it has been made one day and upon a subsequent day the trustee or agent becomes interested in the property, and *Kruse* v. *Steffens*, 47 Ill. 113, is referred to as sustaining the position. In that case it was held : " The fact that the person entrusted by law to make the sale becomes the purchaser, whether by direct or indirect means, creates such a presumption of fraud as requires the sale to be vacated, if application is made in proper time."

The evidence showed that Schrieber was the auctioneer, and bid off and knocked down the lands to himself as the purchaser. He paid no portion of the purchase money, nor did he execute note and mortgage on the premises to secure the same. After the sale nothing was done until the deeds were interchangeably executed by the administrator and Schrieber, and it was said : " As the deeds were both executed at the same time, the law will regard them as forming a part of the same transaction. Considered in this light, the effect was pre-

cisely the same as if the administrator had conveyed the lands to himself."

The question was one of evidence only. It was not said, nor has it been held by this court, where the trustee has fully discharged his duty and ended his trust, he may not subsequently negotiate for the ownership of the trust property. The question was before us, and the reverse was held to be the law in *Munn et al.* v. *Burgess et al.* 70 Ill. 604.

When Bentley determined to hold the property in trust for appellant, Walker's duties as agent for its sale had been entirely concluded. The property was sold, and what subsequently became of it could in no possible way relate back to and affect the question of its original value. Nor do we conceive that it was a matter which Walker was under any obligation to communicate to the trustees when he was informed by Bentley of the disposition he intended to make of the property. If, at the time he recommended that the property should be sold to Bentley, he had known Bentley was designing the purchase for appellant, he should undoubtedly have communicated that fact to the trustees, for they were entitled to know of any interest he might have in the sale which might affect the fairness and good faith of his recommendation. But after the sale was concluded no such consideration could apply.

We are, moreover, of opinion that the claim of appellees is barred as a stale claim, upon the grounds of laches and long acquiescence in the adverse right of appellant. As early as 1858, and thence until the filing of the bill, appellant was in the open and notorious possession of the land by her tenants. Her claim seems to have been known in the neighborhood of the land even at an earlier date by several years. The taxes, except for the year 1863, were all paid in her name and for her. In 1864, a deed from a former owner of the land to her was placed on record, thus giving thenceforth constructive notice that she was claiming as owner.

By the long delay in filing the bill and in consequence of the death of Charles Walker and Seth Terry, many circumstances

that might otherwise be susceptible of satisfactory proof, are unsusceptible of proof, and, in this, delay has wrought injury to appellant, which it is inequitable that appellees should profit by.

The rule applied in *Carpenter* v. *Carpenter*, 70 Ill. 457, *Dempster* v. *West*, 69 id. 613, and recognized in *Munn et al.* v. *Burgess et al.* 70 id. 604, is equally applicable here. The decree will be reversed and the bill dismissed.

*Decree reversed.*

Mr. JUSTICE BREESE: Believing the theory of appellees is the correct theory of this case, and that it is sustained by sufficient proof, I am unable to concur in the opinion of the majority of the court.